Bert E. ARNLUND, et al., Plaintiffs,

v.

**DELOITTE & TOUCHE LLP, Defendant.**

No. Civ. 3:01CV353.

United States District Court,
E.D. Virginia,
Richmond Division.

May 8, 2002.

Steven S. Biss, Richmond, VA, for Plaintiffs.

Michael D. Warden, Griffith L. Green, Richard D. Bernstein, Sidley Austin Brown & Wood, Washington, DC, James T. Williams, Jr., Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Greensboro, NC, for Defendants.

### MEMORANDUM OPINION

PAYNE, District Judge.

Pursuant to Fed.R.Civ.P 12(b)(6), Deloitte & Touche, L.L.P. ("Deloitte") has moved for the dismissal of the Amended Complaint in which Plaintiffs allege that Deloitte committed securities fraud under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) (the "1934 Act") and Securities Exchange Commission Rule 10(b)(5) ("Rule 10(b)(5)"), and actual and constructive common law fraud. The grounds on which dismissal is urged are that: (1) Plaintiffs have failed to state a claim under the 1934 Act and Rule 10(b)(5) because five of the seven Plaintiffs did not allege that they purchased or sold stock of Heilig–Meyers Company ("HM" or the "Company") subsequent to Deloitte's alleged misrepresentation; (2) the Amended Complaint fails to state with particularity facts giving rise to a strong inference of scienter, as required by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"); (3) Cullather, the only Plaintiff who bought his HM shares after the alleged misrepresentations and in reliance upon them, made the purchases after he knew of the Company's "true financial picture," thereby foreclosing, as a matter of law, the adequate pleading of the elements of causation, justifiable reliance and material misrepresentation, which are the *sine qua non* of a valid claim under Section 10(b) and Rule 10(b)(5). Deloitte seeks dismissal of the constructive and actual common law fraud claims based on: (1) failure to adequately allege causation, and actual and reasonable reliance; and

(2) the precept that constructive fraud cannot be premised on alleged negligent misrepresentation.

Finally, Deloitte asserts that all of the Plaintiffs' claims for punitive damages are unfounded because such damages are not recoverable under Section 10(b) or Rule 10(b)(5), and because Plaintiffs cannot show an injury caused by detrimental reliance on the fraud, or any element of wantonness, malice or overreaching.

## STATEMENT OF FACTS

In this action, seven shareholders of HM, a home furnishings retailer, assert claims for securities fraud and common law fraud arising out of misrepresentations and omissions alleged to have been made by HM's outside auditor, Deloitte, in connection with HM's Annual Report issued on May 30, 2000. The facts, as alleged in the Amended Complaint, are recited below. Of course, for purposes of this motion the alleged facts must be taken as true and all favorable inferences that reasonably can be drawn from those facts must be extended to the Plaintiffs.

Deloitte performed an audit of the financial statements of HM as of the fiscal year ending on February 29, 2000. The audit report was incorporated in full in HM's Annual Report (Form 10–K) for that fiscal year issued on May 30, 2000.

On March 22, 2000, Deloitte presented its unqualified audit report to the HM Board of Directors. On May 29, 2000, the HM Board of Directors approved the Annual Report and it was filed with the Securities and Exchange Commission ("SEC") on May 30, 2000.

The Annual Report included an audit opinion wherein Deloitte represented that: (1) Deloitte had audited the balance sheets, consolidated statements of operations and stockholders' equity of HM; (2) HM's financial statements "present fairly, in all material respects, the financial position" of HM as of February 29, 2000; and (3) the audit was in conformity with accounting principles generally accepted in the United States. Deloitte's unqualified audit opinion also represented that, as of February 29, 2000, and May 30, 2000, HM was solvent; that it had almost $535 million in shareholder equity; and a book value of $8.81 per share. *Amended Complaint*, ¶ 14.

It also is alleged that Deloitte knew that its unqualified opinion was to be used in HM's Annual Report and that, as of May 30, 2000, when the Annual Report was issued, Deloitte knew that HM was not solvent; that the shareholder equity was not $535 million; that the book value was not $8.81 per share; and that the audited financial statements did not in most material respects fairly present HM's financial position either as of February 29, 2000, or as of May 30, 2000. *Amended Complaint*, ¶ 127, 141.

Further, the Amended Complaint charges that, before the Annual Report was issued on May 30, Deloitte knew, or should have known, based on the financial information to which it was privy and discussions with HM's management, that there were serious questions about the accuracy of HM's financial statements and that there was material uncertainty about the ability of HM to continue as a going concern. *Amended Complaint*, ¶ 16. Further, it is averred that, by May 30, Deloitte knew that HM's liquidity situation was not accurately portrayed in its audit opinion or in the Annual Report, having been so informed by HM's CEO at a meeting of the HM Board on May 17, and that the Company's liquidity situation was a matter of great concern both to HM's executives and its Board. *Amended Complaint*, ¶ 27. Deloitte is said to have known that, before the Annual Report was issued, the Board had directed management to position the

Company to seek protection under the bankruptcy laws, (*Amended Complaint,* ¶¶ 28, 29); and that the Company had retained an investment banker to determine whether there existed a potential purchaser for HM, facts that were not disclosed in the Annual Report or mentioned in Deloitte's unqualified audit opinion.

The Plaintiffs further charge that Deloitte knew that the Company's financial position would be adversely affected by the termination of its Chief Executive, William DeRusha ("DeRusha"), because, as Deloitte knew, DeRusha's termination would trigger a default in the Company's revolving credit facility. According to the Amended Complaint, DeRusha, the Board and Deloitte all knew before May 30 that DeRusha's employment likely would be terminated shortly thereafter. *See Amended Complaint,* ¶¶ 43–47.

Plaintiffs also allege that, with Deloitte's knowledge, the Annual Report made several other misrepresentations of material fact:

- The Company had grown and was continuing to grow, with new and expansive remodeling plans and an enhanced advertising program;
- As part of a "selective growth strategy", HM planned to select new Heilig–Meyers locations and plans to expand the RoomStore format;
- The Company's competitive environment was comparable in all geographic regions in which it operates. There was no significant threat of competition that would materially affect HM's business;
- There were no significant factors affecting the business of the Company, including, the economy;
- The Board intended to continue its present policy of paying regular quarterly dividends when justified by the financial condition of the company;

- There were no problems with the Company's receivables;
- The allowance for doubtful accounts was adequate.

According to the Amended Complaint, all of these statements were false because the Company's liquidity was in jeopardy and because the Company was selling assets rather than remodeling and effecting a "selective growth strategy," all of which affected the Company's business, its ability to compete and its financial viability.

On November 27, 2000, HM filed its quarterly report with the SEC. The quarterly report revealed that by August 31, 2000:

1. HM's assets had shrunk over $611,474,000;
2. Total revenues for the quarter decreased 7.8%;
3. Operating expenses exceeded revenue by over $48 million;
4. The net loss increased $536,835,000;
5. Accounts payable increased by $27,313,000;
6. The loss per share was ($9.71); and
7. The total shareholder equity went from $534,748,000 in May 2000 to ($75,057), a decrease of $609,805,000.

That quarterly report also stated that over $142.9 million in goodwill and all of the previously stated book value was gone, *Amended Complaint,* ¶ 119; and that "the equity interests of the Company's shareholders may have no value". *Amended Complaint,* ¶ 120 (citing the Quarterly Report).

According to the Amended Complaint, all Plaintiffs, including Cullather, held onto the HM stock they owned as of May 30, rather than selling it because of their reliance on the material misrepresentations made by, and material facts deliberately not disclosed by, Deloitte. Also, Cullather claims to have bought additional HM Stock

in reliance on representations made by Deloitte on May 30. The Plaintiffs assert that they sustained significant losses in the value of the stock that they bought, or onto which they held, after May 30.

## DISCUSSION

Deloitte's motion to dismiss the Amended Complaint must be assessed in perspective of the foregoing allegations, taken as true. The assessment must be made in perspective of the following legal framework for judging the legal sufficiency of claims for securities fraud and common law fraud.

### A. The Basic Standards For Assessing Motions To Dismiss Under Rule 12(b)(6)

In considering a motion to dismiss a complaint for "fail[ing] to state a claim upon which relief can be granted," a court must construe the complaint in the light most favorable to the plaintiffs, read the complaint as a whole, and take the facts asserted therein as true. Fed.R.Civ.P. 12(b)(6); see Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); In re MicroStrategy, Inc. Securities Litigation, 115 F.Supp.2d 620, 627–28 (E.D.Va.2000); Higgins v. Medical College, 849 F.Supp. 1113, 1117 (E.D.Va.1994). All reasonable inferences must be made in favor of the nonmoving party, and "a count should be dismissed only where it appears beyond a reasonable doubt that recovery would be impossible under any set of facts which could be proven." America Online, Inc. v. GreatDeals.Net, 49 F.Supp.2d 851, 854 (E.D.Va.1999) (citing Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.1992)); see MicroStrategy, 115 F.Supp.2d at 627–28; Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101, 2 L.Ed.2d 80 (1957). A motion to dismiss tests only "the sufficiency of the complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," Republican Party, 980 F.2d at 952, and a motion to dismiss should not be granted unless the court "could not grant relief under any set of facts that the plaintiff could prove consistent with his allegations in the complaint," Carter Machinery Co., Inc. v. Gonzalez, No. 97–0332–R, 1998 WL 1281295, at *2 (W.D.Va.1998) (citing Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)). See also MicroStrategy, 115 F.Supp.2d at 627–28.

Although, as explained below, the PSLRA affects how certain constituent elements of a securities fraud claim are to be measured, nothing in the PSLRA alters these basic precepts for applying Rule 12(b)(6).

### B. Failure To State A claim Under Section 10(b) and 10(b)(5)

The basis for Plaintiffs' statutory fraud claim is Section 10(b) of the 1934 Act, which provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Furthermore, the SEC has promulgated regulations alleged to have been violated, specifically Rule 10(b)(5), which provides:

It shall be unlawful for any person, directly or indirectly, by the use of any

means or instrumentality of interstate commerce, or of the mails or of any facility of any national security exchange:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) *To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading,* or
>
> (c) *To engage in any act,* practice, or course of business which operates or would *operate as a fraud or deceit upon any person,* in connection with the *purchase or sale of any security.*

17 C.F.R. § 240.10b–5 (emphasis supplied).

■ To properly plead a case under Section 10(b) and under Rule 10(b)(5), a plaintiff must allege that: (1) a defendant made a false statement or omitted to make a statement of material fact; (2) with scienter; (3) upon which the plaintiff justifiably relied; and (4) that proximately caused the plaintiff's damages. *MicroStrategy,* 115 F.Supp.2d at 628 (quoting *Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 613 (4th Cir.1999)); *accord Hillson Partners Ltd. Partnership v. Adage, Inc.,* 42 F.3d 204, 208 (4th Cir.1994); *Malone v. Microdyne Corp.,* 26 F.3d 471, 476 (4th Cir.1994).

## 1. Plaintiffs' Asserted Lack Of Standing

Before turning to the legal sufficiency of the securities fraud claim, it is necessary to address whether, as Deloitte contends, some, or all, of the Plaintiffs lack standing to prosecute such claims. As explained below, only one of the seven Plaintiffs,

John Cullather, has standing to pursue any securities fraud claim.

■ The analysis of this issue begins with the settled principle that private claims under Section 10(b) of the 1934 Act and Rule 10(b)(5) may be brought only by persons who *sold* or *purchased* stock *after the date of an alleged misrepresentation,* and that claims by persons alleging that they were fraudulently induced not to sell their shares are legally insufficient in most instances. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Gurley v. Documation Inc.,* 674 F.2d 253, 255–56 (4th Cir.1982); *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.1952).

■ Plaintiffs concede that these settled principles foreclose the securities fraud claims of Bert Arnlund, Robert D'Amico, Donald Duncan, Gregory Freeman and Joseph Graziano entirely and, the securities fraud claims of Daniel Mahoney and John Cullather to the extent that their purchases were made before May 30, 2000.[1] Furthermore, although Mahoney also purchased a number of HM shares after the alleged misrepresentation on May 30, the Amended Complaint specifically avers that "Mahoney purchased the latter block of shares as a result of express misrepresentations made by Heilig–Meyers' public relations personnel concerning the Heilig–Meyers' bankruptcy." *Amended Complaint,* ¶ 4. This, of course, concedes that Mahoney has no federal securities law claim against Deloitte as to shares bought by him after May 30 because he did not rely on any misrepresentation made by Deloitte. *Hearing Transcript,* February 14, 2002, at 53.

■ Deloitte accepts that Cullather purchased some HM shares after May 30,

---

**1.** *Plaintiffs' Memorandum in Opposition Motion to Dismiss Amended Complaint,* at 10 & n. 2.

2000, the date of the alleged publishing of the misrepresentations. *Defendant's Reply Memorandum of Points*, at 2–3. Cullather, then, is the only plaintiff whose federal securities claims need to be analyzed for legal sufficiency.

### 2. Has The Element Of Scienter Been Adequately Pleaded?

Deloitte's attack on the adequacy of the securities fraud claim is principally a challenge to the sufficiency of the allegations about Deloitte's state of mind, *i.e.*, the element of scienter. At its core, the argument is that the Amended Complaint fails the heightened standard for pleading scienter that is created by PSLRA.

### (a) The Legal Principles Applicable To Testing The Sufficiency Of The Scienter Element

In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court held that a private plaintiff who seeks damages under Section 10(b) and Rule 10(b)(5) must allege that the defendant acted with scienter, an "intent to deceive, manipulate, or defraud." *Id.*, 425 U.S. at 193, 96 S.Ct. 1375. An allegation of negligence was deemed to be insufficient to state a claim for securities fraud. *Id.*, 425 U.S. at 210, 96 S.Ct. 1375. The Supreme Court, however, did not decide whether pleading recklessness under Section 10(b) and Rule 10(b)(5) is sufficient to satisfy the scienter requirement. *See id.*, 425 U.S. at 193 n. 12, 96 S.Ct. 1375. At the same time, the Court observed that recklessness "is considered to be a form of intentional conduct" in some areas of the law. *Id.*

Since *Hochfelder*, the Courts of Appeals that have addressed this issue have accepted that some form of recklessness is sufficient to satisfy the element of scienter in private securities fraud cases. *See, e.g., Securities and Exchange Commission v. Gotchey*, 1992 WL 385284, at * 8 n. 23, 981 F.2d 1251 (4th Cir.1992) (unpublished *per curiam* opinion) (holding that "severe recklessness satisfies scienter requirement" (citation omitted)); *Securities and Exchange Commission v. Steadman*, 967 F.2d 636, 641 (D.C.Cir.1992); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569–70 (9th Cir.1990); *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1244 (3d Cir.1989); *Van Dyke v. Coburn Enter. Inc.*, 873 F.2d 1094, 1100 (8th Cir.1989); *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir.1989); *Hackbart v. Holmes*, 675 F.2d 1114, 1117–18 (10th Cir.1982); *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961–62 (5th Cir.1981) (en banc); *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1023–24 (6th Cir. 1979); *Cook v. Avien, Inc.*, 573 F.2d 685, 692 (1st Cir.1978); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 46 (2d Cir.1978); *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1044 (7th Cir.1977).

Also, in the years following *Hochfelder*, there arose different standards by which to measure the adequacy of allegations of scienter in securities fraud cases. It is generally accepted that, by the time Congress enacted the PSLRA, the Second Circuit had adopted the most rigorous test for pleading scienter. *See, e.g.,* Gregory P. Joseph, *Developments Under the Private Securities Litigation Reform Act*, November 12, 1998, SD39 ALI–ABA 753, 756; Kim Ferchau, Comment, *The Circuits Divide: Pleading Scienter Under the Private Securities Litigation Reform Act of 1995*, 31 U.Tol.L.Rev. 449, 452 (2000). Under the Second Circuit's standard, a plaintiff had to allege facts showing either (1) a defendant's "motive and opportunity" to commit fraud,[2] or (2) strong circumstantial

---

2. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994) ("Motive

evidence of conscious or reckless behavior. *See Shields,* 25 F.3d at 1128. At the other end of the spectrum, the Ninth Circuit had declined to require a plaintiff to allege any specific facts to survive a motion to dismiss, finding that general allegations of scienter were sufficient to the adequate articulation of the element of scienter. *See In re GlenFed, Inc. Securities Litig.,* 42 F.3d 1541, 1545 (9th Cir.1994).

In 1995, Congress concluded that Fed. R.Civ.P. 9(b), requiring plaintiffs alleging fraud claims to plead with particularity, had "not prevented abuse of the securities laws by private litigants." H.R.Conf.Rep. No. 104–369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 740. On December 22, 1995, Congress amended the 1934 Act by passing the PSLRA.[3] *See* Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67 (1995).

As to pleading the element of scienter, the PSLRA amendments require the following:

> In any private action arising under this chapter in which the plaintiff may recover money damages on proof that the defendant *acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference* that the defendant *acted* with the *required state of mind.*

would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged.").

3. The legislation was the result of heavy lobbying by corporate America, the accounting profession and the securities industry (*e.g.* brokerage houses, investment bankers and accounting firms). *See, e.g.,* John Von Brachel, *CPAs on Capitol Hill: A Behind–the–Scenes Look at the Passage of Securities Litigation*

15 U.S.C. § 78u–4(b)(2) (emphasis supplied). The PSLRA provides that, if a plaintiff does not meet this requirement, a court may, on any defendant's motion, dismiss the complaint. *See* 15 U.S.C. § 78u–4(b)(3).

As courts have observed, the PSLRA did not change the nature and degree of scienter that a plaintiff must prove to prevail in a securities fraud case, but instead changed only what a plaintiff must plead in the complaint in order to survive a motion to dismiss. *See, e.g., In re Glenayre Techs. Inc. Sec. Litig.,* 982 F.Supp. 294, 298 (S.D.N.Y.1997). Indeed, the PSLRA "nowhere defines what the 'required state of mind' is for any of the kinds of actions that might be brought" under the 1934 Act. *In re Baesa Sec. Litig.,* 969 F.Supp. 238, 240 (S.D.N.Y.1997). However, as our Court of Appeals has put it, to establish scienter at trial, a plaintiff must prove that the defendant acted intentionally, which may be shown by recklessness, *see Malone v. Microdyne Corp.,* 26 F.3d 471 (4th Cir. 1994), but to "prevent abusive and meritless lawsuits," H.R.Conf.Rep. No. 104–369, at 31 (1995), U.S.C.C.A.N.1995, 679, at 730, the PSLRA heightens the standard for pleading scienter, and so "chang[es] what a plaintiff must plead in his complaint in order to survive a motion to dismiss." *Phillips v. LCI Intern., Inc.,* 190 F.3d 609, 620 (4th Cir.1999); *see also In re Comshare,* 183 F.3d 542, 548–49 (6th Cir.1999).

*Reform,* Journal of Accountancy, June 1996, Vol. 181, No. 6, at 15; Jim Kelly, *Accountancy: US Cavalry May Come to the Aid of Big Six,* Financial Times (London), July 13, 1995, at 10. The legislation was opposed by the SEC. Barbara Moses, *SEC Securities Litigation Reformed?,* S & P's The Review of Securities & Commodities Regulation, February 28, 1996, Vol. 29, No. 4; at 37; Sharon Walsh, *House Overrides Veto of Securities Bill; Senate May Vote Today on Frivolous Shareholder Lawsuits,* The Washington Post, December 21, 1995, at A20.

The contours of this heightened standard are not defined in the PSLRA. However, the Conference Committee Report on the PSLRA indicated that the "strong inference" language is "based in part on the pleading standard of the Second Circuit." House Conference Report No. 104–369, Joint Explanatory Statement of the Committee of Conference, *reprinted in* 1995 U.S.C.C.A.N. 730, 740 ("Conference Report"). The Conference Report cautioned, however, that "because the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard." *Id.* That textual statement in the report is annotated with the comment that: "[f]or this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity, and recklessness." *Id.*, 1995 U.S.C.C.A.N. at 747 n. 23.

On the other hand, a separate report issued by the Senate Committee on Banking, Housing and Urban Affairs suggests that pre-PSLRA decisional law from the Second Circuit also is useful in defining whether a plaintiff has met the heightened pleading requirements. *See* Senate Report No. 104–98, *reprinted in* 1995 U.S.C.C.A.N. 679. That report explains:

> The Committee *does not adopt a new and untested pleading standard* that would generate additional litigation. Instead, the Committee *chose a uniform standard modeled upon* the pleading *standard of the Second Circuit.* Re-

garded as the most stringent pleading standard, the Second Circuit requires that the plaintiff plead facts that give rise to a 'strong inference' of defendant's fraudulent intent. The Committee *does not intend to codify* the *Second Circuit caselaw* interpreting this pleading standard, although courts may find this body of law instructive.

*Id.*, 95 U.S.C.C.A.N. at 694 (emphasis supplied).

The Conference Report thus seems to say that, although the heightened pleading requirement has its genesis, in part, in the Second Circuit's "strong inference" concept, the decisional law of the Second Circuit respecting how "motive, opportunity and recklessness" may tend to establish such an inference was not codified because the Conference Committee's purpose was to strengthen the existing pleading requirements. The comment by the Senate Committee on Banking, Housing and Urban Affairs suggests that the Second Circuit's decisional law nonetheless can be useful as an interpretive aid.[4]

Given these somewhat contradictory observations, it is unsurprising that there is "widespread disagreement among courts" as to what constitutes the proper pleading of the element of scienter under the PSLRA. *See Phillips,* 190 F.3d at 620–21. For example, the United States Courts of Appeals for the Second and Third Circuits have held that the requisite "strong inference" of scienter may be established by: (a) alleging facts to show that defendants

---

**4.** For further description and analysis of the legislative history of the PSLRA, *see, e.g.,* Kim Ferchau, Comment, *The Circuits Divide: Pleading Scienter Under the Private Securities Litigation Reform Act of 1995,* 31 U.Tol.L.Rev. 449 (2000); Scott H. Moss, Comment, *The Private Securities Litigation Reform Act: The Scienter Debacle,* 30 Seton Hall L.Rev. 1279 (2000); Patricia J. Meyer, Note, *What Congress Said About the Heightened Pleading Stan-*

*dard: A Proposed Solution to the Securities Fraud Pleading Confusion,* 66 Fordham L.Rev. 2517 (1998); William S. Lerach and Eric Alan Isaacson, *Pleading Scienter Under Section 21D(B)(2) of the Securities Exchange Act of 1934: Motive, Opportunity, Recklessness, and the Private Securities Litigation Reform Act of 1995,* 33 San Diego L.Rev. 893 (1996).

had both motive and opportunity to commit fraud; or (b) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *See Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 537 (2d Cir.1999); *In re Advanta Corp. Securities Litig.*, 180 F.3d 525, 534–35 (3d Cir.1999).[5]

The United States Court of Appeals for the Ninth Circuit has held that "a private securities plaintiff proceeding under the PSLRA must plead, *in great detail,* facts that constitute *strong circumstantial evidence of deliberately reckless or conscious misconduct.*" *In re Silicon Graphics Inc. Securities Litig.*, 183 F.3d 970, 974 (9th Cir.1999) (emphasis supplied). In *Silicon Graphics,* the Ninth Circuit distinguished "deliberate" recklessness from the "simple" recklessness standard required under the Second Circuit test, holding that:

> although facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a *strong* inference of deliberate recklessness. In order to show a strong inference of deliberate recklessness, plaintiffs *must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity.* Accordingly, we hold that *particular facts* giving rise to a *strong inference of deliberate recklessness,* at a *minimum,* is required to satisfy the heightened pleading standard under the PSLRA.

*Id.* (emphasis supplied).

The United States Courts of Appeals for the Sixth and Eleventh Circuits have held that a plaintiff may survive a motion to dismiss under the PSLRA by pleading facts that give rise to a *strong inference of*

*simple recklessness,* but that allegations of a motive and opportunity to commit securities fraud, standing alone, do not adequately plead the element of scienter for purposes of Section 10(b) liability. *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 550–51 (6th Cir.1999) (The Sixth Circuit adopted the standard of recklessness defined in *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.1977)), stating that "recklessness [is] highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it," *Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1024 (6th Cir.1979) (citing *Sundstrand* ), and concluded in *In re Comshare* that, "[b]ecause it is clear that recklessness, understood as a mental state apart from negligence and akin to conscious disregard, may constitute scienter, we conclude that under the PSLRA, a plaintiff may survive a motion to dismiss by pleading facts that give rise to a 'strong inference' of recklessness." 183 F.3d at 549); *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1283 (11th Cir.1999) ("The 'severe recklessness' recognized by our Circuit, like the actionable level of scienter in most other circuits, was based on the Seventh Circuit's formulation of recklessness in *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1044 (7th Cir.1977))." *Bryant,* 187 F.3d at 1284 n. 21. The Eleventh Circuit went on to recognize that the Ninth Circuit created a definition of "super-recklessness" and held that "the attempt [to create a higher standard of recklessness] is inconsistent with the plain statutory language [of the PSLRA]." *(Id.)*

---

5. That standard was applied by the Second Circuit before the PSLRA, *see Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994), and had been the most stringent test for pleading scienter under Section 10(b), *see In re Comshare, Inc. Securities Litig.,* 183 F.3d 542, 549 (6th Cir.1999).

The United States Court of Appeals for the First Circuit adopted a standard that it characterized as being "close" to that articulated by the Sixth Circuit, but rejected the argument that facts showing motive and opportunity could never be enough to permit the drawing of a strong inference of scienter. *Greebel v. FTP. Software, Inc.*, 194 F.3d 185, 196–98 (1st Cir.1999) (stating that the debate about adoption of the Second Circuit standard was "somewhat beside the point," noting that the First Circuit has always "analyzed the particular facts alleged in each individual case to determine whether the allegations were sufficient to support scienter.").

The United States Court of Appeals for the Fourth Circuit has "not yet determined which pleading standard best effectuates Congress's intent." *Phillips*, 190 F.3d at 621. In *Phillips*, the Fourth Circuit did not address the issue because it found that the plaintiff stockholders "failed to allege facts sufficient to meet even the most lenient standard possible under the PSLRA, the two-pronged Second Circuit test." *Id.* *Phillips* noted that other "courts, however, relying on further discussion in the PSLRA'S legislative history have interpreted the PSLRA as instituting an even more stringent standard." 190 F.3d at 620 (citing to H.R.Conf.Rep. No. 104–369, at 41, U.S.C.C.A.N.1995, 730, 740 ("Because the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting the pleading standard.")). The Fourth Circuit also noted that, in *Silicon Graphics*, the Ninth Circuit required allegations constituting circumstantial evidence of deliberately reckless or conscious misconduct. 183 F.3d 970, 973 (9th Cir.1999). "The [*Silicon Graphics*] court distinguished 'deliberate' recklessness from the 'simple' recklessness required under the Second Circuit test, describing the former as 'facts that come closer to demonstrating intent.'" *Phillips*, 190 F.3d at 620–21 (quoting [*Silicon Graphics*,] 183 F.3d at 973).

■ However, in *Phillips*, our Court of Appeals defined "recklessness" under Section 10(b) as "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." 190 F.3d at 621 (citing to *Hoffman v. Estabrook & Co., Inc.*, 587 F.2d 509, 517 (1st Cir.1978)) (quoting *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir.1977), which employed the widely recognized recklessness standard established in *Sundstrand Corporation v. Sun Chemical Corporation et al.*, 553 F.2d 1033 (7th Cir.1977)). That, then, is the definition of recklessness that animates the analysis of the scienter element in this case because the Amended Complaint does not articulate the scienter element in terms of motive and opportunity.[6] *Amended Complaint*, ¶¶ 127–141. Hence, it is unnecessary to address the adequacy of a pleading in which motive and opportunity are the pleaded predicates of the scienter element.

■ Whether a plaintiff adequately has set out facts constituting conscious misbehavior requires no dissertation on what that term means. Instead, that determination is made by assessing the words in the Amended Complaint in the context of the events on which it focuses. And, to measure the adequacy of the recklessness

---

6. It is likely that the Congressional comments refusing to codify the Second Circuit's pleading standards merely relate to cases wherein motive and opportunity are the predicate for the scienter element. That is not the issue presented here.

aspect of the scienter assertions, the Amended Complaint must be examined to see whether it alleges acts that are "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Phillips*, 190 F.3d at 621.

When making the assessment whether scienter has been adequately pleaded, it is prudent to keep in mind that the PSLRA does not require a plaintiff to prove his case in his complaint. And, it is appropriate to recall that the heightened standard of pleading scienter was meant simply to prevent strike suits and other abuses that had arisen in securities fraud litigation, largely because, in many jurisdictions, trial judges simply had not enforced the rather obvious requirements of Rule 9 in securities class action litigation. *See, e.g., In re Advanta*, 180 F.3d at 531 ("The purpose of the Act was to restrict abuses in securities class-action litigation, including: (1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of "deep pocket" defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys.) *See also In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 548 (6th Cir.1999); S.Rep. No. 104–98, at 2 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 683. Also, it must be remembered that a plaintiff generally must frame the facts respecting the defendant's mental

state (*i.e.*, the scienter element of the claim) without the benefit of discovery, and therefore, most often, allegations about a defendant's culpable state of mind must be drawn from limited state of mind evidence augmented by circumstantial facts and logical inferences.[7]

■ These several guideposts teach that it is sufficient to plead scienter by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior, and the adequacy of the scienter allegations is to be measured by the facts collectively alleged in the complaint. *MicroStrategy*, 115 F.Supp.2d at 628–30, 633. Thus, a plaintiff can satisfy the heightened burden of pleading scienter under the PSLRA by identifying specific facts and circumstances available to the auditor that are unusual, suspicious or that, for other reasons, would put the auditor on notice of matters that ought to be looked into or reported on because, if true, they could alter an auditor's opinion or foreclose it entirely, and by alleging that these facts were ignored, either deliberately, recklessly or by failing to follow generally accepted accounting and auditing principles. *In re SmarTalk*, 124 F.Supp.2d 505, 513–514 (S.D.Ohio 2000). And, if the conduct is alleged to be reckless (rather than conscious) behavior, it must be, for cases in this circuit, of the sort that meets the standard of recklessness set by our Court of Appeals in *Phillips*.

■ Of course, conclusory allegations and assertions based on "information and belief," not accompanied by the support required by Section 78u–(b)(1), are inadequate.[8] *See In re Aetna Inc. Sec.*

---

**7.** Of course, that is not the case when Congress or a government agency has conducted an investigation on whether antecedent administrative judicial proceedings have produced a record. But, in most cases, plaintiffs do not have this base of information on which to state their case.

**8.** As to pleadings based on information and belief, the PSLRA requires:

> if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
> 15 U.S.C. § 78u–4(b)(1).

*Lit.,* 34 F.Supp.2d 935, 942–43 (E.D.Pa. 1999); *Krim v. Coastal Physician Group, Inc.,* 81 F.Supp.2d 621 (M.D.N.C.1998); *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994) (pleading techniques that couple a factual statement with a conclusory allegation of fraudulent intent are so broad and conclusory as to be meaningless).[9] But, if supported by particularized facts upon which that belief was formed, even allegations based on information and belief are available to help state a valid claim.

 Each relevant factual allegation is to be considered individually and "as part of the overall factual picture painted by the complaint." *MicroStrategy,* 115 F.Supp.2d at 631. "If the totality of the circumstances alleged raises a 'strong inference' of the requisite state of mind, it is immaterial whether plaintiffs satisfy their burden by 'pleading motive and opportunity, conscious misbehavior, recklessness, or by impressing upon the Court a novel legal theory.'" *MicroStrategy,* 115 F.Supp.2d at 631 (quoting *In re Health Management, Inc. Sec. Litig.,* 970 F.Supp. 192, 201 (E.D.N.Y.1997)).

### (b) Assessment Of The Amended Complaint; Allegations Of Scienter

In this case, it is alleged in the Amended Complaint that, on May 30, 2000, Deloitte, intentionally or with deliberate recklessness, certified the financial condition of Heilig–Meyers, and falsely represented that Deloitte had audited the balance sheets, consolidated statements of operations and stockholders' equity of HM, that

HM's financial statements presented fairly, in all material respects, the financial position of HM, and that the audit was in conformity with accounting principles generally accepted in the United States. *See Amended Complaint,* at 2, ¶¶ 13, 127.

It is alleged in the Amended Complaint that "[p]rior to issuance of the annual report, Deloitte knew or should have known that there were serious questions concerning the accuracy of Heilig–Meyers' financial statements and material uncertainty as to the Company's ability to continue as a going concern." *Amended Complaint,* ¶ 16. "In spite of its knowledge, Deloitte never amended its audit opinion or the notes accompanying the financial statements or issued a qualified opinion." *Amended Complaint,* ¶ 17.

Subsequent paragraphs in the Amended Complaint detail the reasons why Deloitte knew, or should have known, either with intent or recklessly, that there were material deficiencies in the Annual Report and that the audit report should have been amended or qualified. Those augmenting allegations are described below as part of the totality of the circumstances.

### i. Deloitte's Familiarity With The Company's Finances, Its Documents And Its Management

Not infrequently, the Amended Complaint makes reference to: (1) the function and role of Deloitte as HM's auditor for the period at issue and for several years previously; and (2) the extensive access that Deloitte is said to have had to HM's records and to its highest executives.

---

**9.** Such vague and assumptive allegations were routinely rejected by courts even before the PSLRA was passed. *See Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1019 (5th Cir.1996) (inference of fraud not supported by "rote conclusory allegations that the defendants 'knowingly did this' or 'recklessly did that'"); *Shields,* 25 F.3d at 1129; *Greenstone*

*v. Cambex Corp.,* 975 F.2d 22, 25 (1st Cir. 1992) ("The courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity, *unless the complaint also sets forth specific facts* that make it reasonable to believe that defendant knew that a statement was materially false or misleading.").

From these allegations, Deloitte draws the conclusion that the pleaded predicate for the scienter element is access to HM's documents and personnel. Thus, says Deloitte, the scienter element is inadequately pleaded.

■ Without doubt, merely pleading access to the company's personnel (even highly placed executives) and records does not adequately allege scienter, see, e.g., In re Criimi Mae, Inc. Sec. Litig., 94 F.Supp.2d 652, 661 (D.Md.2000), because, otherwise, "every corporate executive who participates in the day-to-day management of his company would be exposed to liability for securities fraud."[10] The same is true for accountants serving as auditors. Queen Uno Ltd. P'ship v. Coeur D'Alene Mines Corp. et al., 2 F.Supp.2d 1345, 1360 (D.Colo.1998).

Thus, courts rightly have rejected efforts to plead scienter solely by pleading access. However, this case is markedly different from the decisions on which Deloitte relies. An appropriate illustration of the point is found by examining the decision in Queen Uno, wherein the court held that it was "implausible that because an accountant had access to a company's internal data, it by implication was aware of any fraudulent scheme, no matter how far-reaching." Id. That simply is not the picture painted by the Amended Complaint in this case.

■ As the Amended Complaint alleges, Deloitte, which was engaged to review HM's financial documents, and to audit the company's financial statements, had long been the auditor for HM. Amended Complaint, ¶ 10. And, it is alleged that:

Deloitte's involvement and participation was integral to the creation of all Heilig–Meyers' SEC filings. Deloitte worked intimately and in concert with management and key executives of Heilig–Meyers to produce quarterly and annual financial reports and to give tax planning advice for many years. Deloitte audited the Company's 1998 and 1999 annual reports. Deloitte had unrestricted and unfettered access to Company employees, management, books and records.

Amended Complaint, ¶ 10 (emphasis supplied). It is then averred that "[i]n performing its audit, Deloitte was privy to inside, confidential information concerning the Company's financial condition and intended future course of operations." Amended Complaint, ¶ 23. This privileged position is not offered alone as the requisite strong inference of scienter, rather, it simply is posited as part of the context to support the particulars of scienter set forth in the other allegations of the Amended Complaint.

It is inferrable that Deloitte was in a position to appreciate the significance of a

---

10. *In re Peritus Software Servs., Inc. Securities Litig.*, 52 F.Supp.2d 211, 228 (D.Mass.1999) (finding allegations that defendants held executive and managerial positions and had access to the alleged adverse non-public information insufficient to raise strong inference that defendants had knowingly or recklessly caused the company to issue statements that were false or omitted material information); *Lirette v. Shiva Corp.*, 27 F.Supp.2d 268, 283 (D.Mass.1998) (rejecting attempt to plead scienter merely by asserting that CEO and CFO "were privy to confidential proprietary information concerning the Company and its operations, finances, financial condition, products and business prospects"); *In re Health Mgmt., Inc. Securities Litig.*, 970 F.Supp. 192, 204–05 (E.D.N.Y.1997) (allegation that defendant held senior management position and was "privy to inside information" insufficient, standing alone, to demonstrate strong inference of recklessness or conscious misbehavior); *Duncan v. Pencer*, 1996 WL 19043, at *14 (S.D.N.Y.1996) (allegation that due to their positions with the company and access to inside information, defendants must have known of the falsity of financial statements filed with the SEC was insufficient to plead conscious misbehavior or recklessness).

number of events that had occurred by, or that were underway in, the fiscal year being audited. And, from the kind of tasks Deloitte is said to have engaged in, the concert of activity with executive management (who no doubt knew exactly what the true financial and operational affairs of the Company were) and the responsibility of an auditor, it is inferrable that Deloitte either knew of the deterioration of the Company's finances between February 28 and May 30 or with great recklessness ignored it. Those inferences are underscored by the specifically alleged access to, and discussions with, HM's management and its Board of Directors about facts that were highly pertinent to HM's financial affairs and its viability as a going concern as of May 30.

It is also reasonable to infer that, because of Deloitte's essential function, Deloitte was familiar with the employment agreements of key executives and knew that, upon termination, a severance compensation package would be due. *Amended Complaint,* ¶ 43. Thus, it is said that Deloitte knew, or should have known, that:

> [t]ermination of DeRusha's employment [would] substantially and materially affect[ ] the Company's financial position. Deloitte was familiar with the terms of the revolving credit facility.

*Amended Complaint,* ¶ 46. It also is alleged that:

> Upon information and belief, Deloitte reviewed the loan documents during its audit to determine whether Heilig–Meyers was in compliance. Prior to May 30, 2000, Deloitte knew or certainly should have known that the 'special bonuses', severance and other additional compensation awarded to DeRusha would trigger an actual default under Heilig–Meyers' revolving credit facility and create

further financial pressure for Heilig–Meyers.

*Amended Complaint,* ¶ 46.

There also are allegations that Deloitte knew that the Company's operations were not as represented. For instance, it is alleged that the Company was achieving liquidity, in part, by selling off assets, not, as represented in the Annual Report, by restructuring its operations. *Amended Complaint,* ¶ 68 ("Unbeknownst to Plaintiffs, the representations in the annual statement were also false in that Heilig–Meyers was not implementing 'strategic initiatives associated with core store turnaround'. It was simply selling off assets."). Those allegations too are supported by the claims that Deloitte was intimately knowledgeable about the Company's financial affairs and operations by virtue of its access to, and involvement with, HM's management.

Indeed, it is alleged that Deloitte affirmatively participated in the positioning of HM for bankruptcy as directed by HM's Board of Directors. That is said to have begun before May 30.

In other words, the Amended Complaint alleges not only that Deloitte had access to financial documents, but also that Deloitte was directed by the high level executives as it participated in this alleged fraudulent scheme. *See infra,* Part B.2.b.iv. At the same time, a goodly number of corroborating facts and inferences assist the claim of access and participation in finances.

These allegations are integral to the establishment of scienter under the circumstances of this case, because Deloitte did not just have access, but rather, the Amended Complaint alleges that, along with being intimately familiar with the finances of HM, Deloitte played a key role in assisting in the preparation for bankruptcy, knew about the discussion of De-

Rusha's departure, and knew about the liquidity and credit concerns.

### ii. Knowledge Of Undisclosed Liquidity Issues

■ It is alleged in the Amended Complaint that, before February 29, 2000, Deloitte knew about the financial problems that HM was having and about the ongoing negotiations with lenders and banks to secure lines of credit to resolve some of HM's liquidity issues. It is reasonable to infer that Deloitte was necessarily aware of the Company's concerns about liquidity because lines of credit and liquidity are highly relevant to the cash flow of a going concern, and Deloitte's charge is to know, and to understand, the financial statements as well as the financial contingencies with which the Company was grappling. Furthermore, the Amended Complaint alleges that:

> Through *conversations with DeRusha and other key executives* and *review* of the Company's *financial and operational documents* as part of the audit, Deloitte *knew*, for instance, that prior to February 29, 2000, Heilig–Meyers faced certain *liquidity issues* and that it was in *negotiations* with the Banks concerning the Company's *revolving credit facility*. The liquidity issues were discussed extensively by management and the Board. The Company's liquidity issues persisted past February 29, 2000 and the 'negotiations' with lenders who comprised the revolving credit facility were not complete prior to February 29, 2000.

*Amended Complaint,* ¶ 23 (emphasis supplied). And, the Amended Complaint specifically asserts that "[t]he nature and effect of the Company's liquidity issues and the status of the negotiations over the revolving credit facility were ignored by Deloitte." *Amended Complaint,* ¶ 24.

The Amended Complaint also avers that:

> Between March 22, 2000 and May 30, 2000, Deloitte became aware of certain matters that ought to have caused it to question or revise its unqualified audit opinion. Through its interaction and discussions with management and preparation of the Company's financial statements and reports, *Deloitte knew that the liquidity issues had not been resolved and that they were of major concern to Heilig–Meyers executives.* Deloitte knew that if the Company did not enter into an extension of its existing bank credit facility by May 25, 2000, it would be in default under the terms of that facility. Deloitte knew that in the event that satisfactory arrangements could not be reached with the lenders, Heilig–Meyers would be required to seek protection under the federal bankruptcy laws.

*Amended Complaint,* ¶ 27 (emphasis supplied).

It is further alleged that the liquidity issues, as a general matter, were viewed as such a significant problem by the Board members and executives that bankruptcy had to be considered as an option, and that discussions of these topics took place in Deloitte's presence.

> Even though Goodman [the Chief Financial Officer] advised on May 17, 2000 that the 'liquidity discussion' in the annual report 'needed to be revised', the discussion of liquidity in the report and the notes accompanying the financial statements made absolutely no mention of the Company's 'extensive' discussions with McGuire Woods and the investment bankers concerning the 'strategic alternative' of bankruptcy.

*Amended Complaint,* ¶ 64.

> Upon information and belief, when Goodman advised the Board that the liquidity discussion in the annual report 'needed to be revised', he also advised

Deloitte that at least part of the notes accompanying the annual report also 'needed to be revised'. Deloitte knew about the Company's liquidity problems, but never revised its unqualified opinion. Deloitte's report made no provision for the material uncertainty of the Company's financial position as of February 29, 2000.

*Amended Complaint,* ¶ 66. It is reasonable to infer that, when the Chief Financial Officer of a corporation suggests that the liquidity discussion in the Annual Report needs to be revised, and given the then extant financial circumstances (in particular, ongoing credit negotiations, possible defaults, and business steadily on the decline) such revisions would have included discussion with Deloitte, the Company's auditor, about commensurate revisions to the audit report.

Furthermore, it is alleged that Deloitte knew about particular financial arrangements and covenants, and that those arrangements were in trouble.

Deloitte actively ignored and concealed critically significant 'red flags', which ought to have been obvious to anyone who examined Heilig–Meyers' books and records and which should have alerted Deloitte to the fact that Heilig–Meyers' financial statements failed to disclose massive contingencies—the same liabilities that led the Company to seek bankruptcy protection 2½ months later in August 2000. First, Deloitte knew about the *existence of the liquidity problems* prior to February 29, 2000. This alone should have compelled Deloitte to either increase its audit work and investigation to determine whether the Company was financially able to continue to meet its obligations going forward, or to issue at least a qualified opinion. Second, Deloitte knew about the *various defaults* in Heilig–Meyers' $200,000,000.00 revolving credit facility and the negotiations with the Banks prior to February 29, 2000.

The inability of DeRusha and the Board to reach an agreement with the Banks prior to May 25, 2000 (and thereafter) led *the Board to direct management to position the Company for bankruptcy.* Deloitte did no investigation and gave no opinion concerning the effect of the defaults upon the Heilig–Meyers' financial condition and made no determination of the company's ability to continue as a *going* concern.

*Amended Complaint,* ¶ 135 (emphasis supplied).

Finally, the Amended Complaint alleges that Deloitte was deliberately reckless because "Deloitte failed to exercise due professional care and independent judgment. Deloitte did no investigation of the liquidity issues. Deloitte did not determine whether Heilig–Meyers had any short or long-term ability to address the liquidity needs." *Amended Complaint,* ¶ 70. As a result, it is alleged that "Heilig–Meyers' liquidity problems, the conversations with the Banks, the default in the revolving credit facility, the decision to position the Company for bankruptcy, and Deloitte's knowledge of the problems, were totally concealed from the Plaintiffs." *Amended Complaint,* ¶ 49. The Amended Complaint thus charges specifically that, before May 30, Deloitte knew that HM was in serious financial trouble, what that trouble was, and what Deloitte did not disclose about it.

In its Motion to Dismiss, Deloitte seeks to dispose of those allegations with a brief discussion suggesting that a sticker placed on the "Liquidity and Capital Resources" section of "Management's Discussion and Analysis" of the Annual Report resolved concerns regarding liquidity. The argument misses the mark because the sticker does not address all of the alleged misrepresentations. Moreover, the sticker itself can be considered misleading because, al-

though it indicates that there had been trouble with the revolving credit facility, it suggests that the Company's liquidity problems had been resolved. With the ongoing and substantial financial troubles facing HM at the time, the understated appearance of resolution offered by the sticker might well be considered by a finder of fact to be insufficient to negate the allegations of the Amended Complaint that the liquidity problems were evidence of a very troubled company and Deloitte knew that HM was in serious financial trouble, yet did nothing to qualify its clean bill of health audit opinion. These allegations, in context of the Amended Complaint as a whole, provide further substantial support for a strong inference of scienter.

### iii. Knowledge About DeRusha's Termination

It is alleged that the termination of DeRusha, HM's CEO, obligated HM to make severance payments that it could not make and caused a default in HM's credit facility. An independent auditor, intimately familiar with a company's financial situation, reasonably would be expected to know what effect DeRusha's termination likely would have on this precariously poised company and, if known, the fact should have been disclosed or perhaps a qualified opinion should have been issued.

▬▬ The Amended Complaint does not allege that Deloitte knew before May 30 that DeRusha was going to leave the Company or that his employment was to be terminated,[11] but facts are alleged that lead to the inference that DeRusha's termination was the focus of serious consideration before May 30. For instance, the

minutes of the Board meeting of May 29 disclose that the issue of retaining DeRusha was discussed and then voted on, the Board voting to retain him.[12] The fact that the Board voted to retain DeRusha permits an inference that the possibility of his termination was on the table.

Further evidence leading to the inference that serious discussions concerning DeRusha's termination were under way before May 30, comes from the allegation that "Shaffer had already replaced DeRusha long before July 24, 2000, and was holding himself out to the public, investment bankers and others as Heilig–Meyers' 'chief executive officer' and was executing contracts and documents as CEO. Deloitte knew this." *Amended Complaint,* ¶ 94. Given the evidence that the Board considered whether or not to retain DeRusha on May 29, the proximity of the issuance of the Annual Report to DeRusha's exit from the Company, the allegation that the CEO designated to replace DeRusha was already acting as CEO "long before DeRusha's actual termination date," and taking into account Deloitte's rather intimate connection to HM's management and knowledge of its financial and business affairs, it is inferrable that, before May 30, Deloitte knew that HM was at least considering the replacement of DeRusha. Further, given that Deloitte knew the terms of the revolving credit agreement and about the liquidity issues that would arise from the substantial severance package apparently owing to DeRusha upon termination, it is inferrable that Deloitte knew that HM's finances were in such a state that reorganization might be re-

---

**11.** It is alleged in Paragraph 47 of the Amended Complaint that "[a]lthough it was known prior to May 30, 2000, it was not disclosed until July 24, 2000 that DeRusha intended to terminate his employment with Heilig–Meyers." However, it is not specified who it was

that knew DeRusha was going to terminate his employment.

**12.** *See Defendant Deloitte & Touche LLP's Memorandum of Points and Authorities in Support of Its Motion To Dismiss Plaintiffs' Amended Complaint,* at 14 and Exhibit 5.

quired upon DeRusha's termination. The Amended Complaint says as much:

> Termination of DeRusha's employment substantially and materially affected the Company's financial position. Deloitte was familiar with the terms of the revolving credit facility. Upon information and belief, Deloitte reviewed the loan documents during its audit to determine whether Heilig–Meyers was in compliance. Prior to May 30, 2000, Deloitte knew or certainly should have known that the 'special bonuses', severance and other additional compensation awarded to DeRusha would trigger an actual default under Heilig–Meyers' revolving credit facility and create further financial pressure for Heilig–Meyers.

*Amended Complaint,* ¶ 46. Taken together with the other allegations of the Amended Complaint, the allegation about DeRusha's termination, and Deloitte's knowledge of it, help to form an adequate pleading for the element of scienter.

### iv. Deloitte's Awareness That HM Sought Assistance for Strategic Alternatives, Including Bankruptcy

As further support for a strong inference of scienter on the part of Deloitte, the Amended Complaint contains allegations that Deloitte was aware of, and did not inquire into, or disclose the significance of, the retention of Goldman Sachs, Lazard Freres and McGuire Woods by the Company in seeking strategic alternatives, including bankruptcy. The relevant allegations include:

a. that, on May 29, 2000, Goodman disclosed that management had engaged Goldman Sachs to review strategic alternatives (*Amended Complaint,* ¶ 31);

b. that, "[p]rior to May 30, 2000, management of Heilig–Meyers also determined that there was a need and researched the hiring of both special

counsel and a debt restructuring advisor to assist the Company with reviewing alternatives in view of the Company's financial condition[,]" (*Amended Complaint,* ¶ 51);

c. that, before May 17, 2000, the Board had sought and received, legal advice from McGuire Woods concerning filing for protection under the federal bankruptcy laws (*Amended Complaint,* ¶ 67(b)); and,

d. that, upon information and belief, the Lazard Freres retainer agreement was considered, discussed and negotiated over the period from late May 2000 to July 1, 2000, (*Amended Complaint,* ¶ 52).

■ It is alleged that Deloitte knew that these firms had been engaged and knew why they had been engaged. If, as is alleged, Deloitte knew that HM was seeking bankruptcy advice and advice respecting strategic alternatives, and, at the same time knew about the Company's other financial woes, it is inferrable that Deloitte knew that HM was not as financially stable as presented in Deloitte's audit of the financial statements, or acted with severe recklessness in failing to qualify its opinion.

### v. The Temporal Proximity Of Related Events

■ An inference of scienter can be supported by the temporal relationship among several events. However, pleading temporal proximity alone has not been viewed as adequately establishing scienter: "[m]ere proximity in time between optimistic or reassuring statements about a company's prospects and filing for bankruptcy protection does not give rise to a strong inference of scienter when, as here, the event that forced the company to seek bankruptcy protection did not occur until after the statements were made." *In re*

*Criimi Mae,* 94 F.Supp.2d at 662. *See also Pitten,* 903 F.Supp. at 949 ("a general averment that one can infer from a negative event or poor performance that the defendant had earlier knowledge of that event or performance without more, will not do.").

██ Here, the Amended Complaint does not seek to ground the scienter element in temporal proximity alone. Instead, allegations indicate that, in light of all the facts elsewhere discussed, the brief lapse of time between the unqualified audit opinion and the reporting by HM of total financial devastation provides further support for Deloitte's knowledge that its unqualified audit opinion was false when issued as part of HM's Annual Report. For example, it is alleged that Deloitte knew by May 30, that HM was in a state of severe financial distress that became publically manifest only two months after Deloitte had blessed the Company as in good financial health.

To illustrate the magnitude of HM's precipitous fall into financial terminal illness, the Amended Complaint focuses on the quarterly report filed with the SEC by HM on November 27, 2000. That report revealed that the following had occurred between May 30, 2000, the date the Annual Report was issued with Deloitte's unqualified audit report, and August 31, 2000, the date that Deloitte completed its audit report for the November 27, 2000, Quarterly Report:

i. HM's assets shrank over $611,474,000;

ii. Total revenues for the quarter decreased 7.8%;

iii. Operating expenses exceeded revenue by over $48 million;

iv. Net loss increased $536,835,000;

v. Accounts payable increased by $27,313,000;

vi. Loss per share was ($9.71);

vii. Total shareholder equity went from $534,748,000 in May 2000 to ($75,057), a decrease of $609,805,000.

*Amended Complaint,* ¶ 113. The quarterly report stated that over $142.9 million in goodwill and all of the previously stated book value to which HM had attested was gone. Moreover, the report announced that "the equity interests of the Company's shareholders may have no value". *Amended Complaint,* ¶ 120. The Amended Complaint alleges that experts have opined that losses of that enormity in that proximity to an unqualified audit opinion are "unprecedented" and "shocking." *Amended Complaint,* ¶ 115.

The temporal proximity between financial viability on May 30 and financial expiration two or so months later supports an inference that can augment the other aspects of the scienter allegations here. That is especially true in perspective of the allegations about Deloitte's knowledge of the details of HM's financial circumstances, its plans, the requisite state of economic activity for the Company to be financially healthy, the knowledge that the Company was considering bankruptcy before May 30, the Company's precarious liquidity status, the possible, perhaps likely, loss of its CEO with the attendant unaffordable financial consequence and the other allegations of the Amended Complaint. *Amended Complaint,* ¶ 119.

### vi. Deloitte's Alleged Knowledge Of The Imminent Bankruptcy

██ Ultimately, if Deloitte knew that HM was considering bankruptcy and reorganization before the issuance of the Annual Report on May 30, and Deloitte did not qualify its opinion, it would be inferrable that Deloitte omitted this material fact in violation of a duty to disclose it, thus acting with the mental state required by the PSLRA.

The Amended Complaint specifically identifies facts that allegedly were known to Deloitte before May 30, and should have been disclosed in the audit report, but were not, or, in deliberate recklessness, were ignored and were not disclosed for that reason. In addition to previously identified allegations, it is alleged in paragraph 27 of the Amended Complaint, that:

Between March 22, 2000 and May 30, 2000, Deloitte became aware of certain matters that ought to have caused it to question or revise its unqualified audit opinion. Through its interaction and discussions with management and preparation of the Company's financial statements and reports, Deloitte knew that the liquidity issues had not been resolved and that they were of major concern to Heilig–Meyers' executives. Deloitte knew that if the Company did not enter into an extension of its existing bank credit facility by May 25, 2000, it would be in default under the terms of that facility. Deloitte knew that in the event that satisfactory arrangements could not be reached with the lenders, Heilig–Meyers would be required to seek protection under the federal bankruptcy laws. The Board directed management to position the Company for the filing of a Chapter 11 bankruptcy.

Thus, the Amended Complaint alleges that, before May 30, Deloitte knew that HM's Board was positioning the Company for bankruptcy, but was concealing that fact because the discussion of liquidity in the report and the notes accompanying the financial statements made absolutely no mention of the Company's 'extensive' discussions with McGuire Woods and the investment bankers concerning the 'strategic alternative' of bankruptcy. *Amended*

*Complaint,* ¶ 64.[13] These allegations further bolster the element of scienter.

The Amended Complaint very bluntly states that "as of May 17, 2000, the Board had directed management to position the Company for bankruptcy;" "McGuire Woods was working on the bankruptcy filing prior to May 30, 2000;" "the Board knew and/or believed that there was also a need to hire special counsel and a debt restructuring advisor to assist the Company in reviewing its alternatives in view of the current financial condition;" "the Company was in discussions with investment bankers concerning bankruptcy and was reviewing the Company's 'strategic alternatives' prior to May 30, 2000;" "Heilig–Meyers liquidity issues were so severe that bankruptcy was the only viable (and inevitable) 'strategic alternative';" *Amended Complaint,* ¶¶ 67(c), (d), (e), (f) and (g).

From these facts taken in perspective of Deloitte's intimate knowledge of the Company's financial affairs and operations, its close communication with management, Deloitte's alleged involvement in many of the activities of the other professionals hired by HM, it is inferrable that, as of May 30, Deloitte knew that the financial statements did not accurately set forth the Company's financial situation, that the Company had shareholder equity of $535 million and a book value of $8.81 per share. And, if Deloitte did not know that, it may well have been deliberately reckless in reporting those statements on May 30 and in issuing an unqualified opinion.

### vii. The Totality Of The Circumstances

If proven, the facts that Deloitte was intimately familiar with the financial work-

---

**13.** Allegations in the Amended Complaint also claim that "[p]rior to May 30, 2000, management of Heilig–Meyers also determined that there was a need and researched the hiring of both special counsel and a debt restructuring advisor to assist the Company with reviewing alternatives in view of the Company's financial condition." *Amended Complaint,* ¶ 51.

ings of HM, knew of the serious liquidity and credit issues, knew that DeRusha's termination was either imminent or being seriously considered, assisted third parties in seeking strategic alternatives for the Company including reorganization and bankruptcy, the unprecedented losses the Company suffered in such a short period of time and the knowledge that the Company was positioning itself for bankruptcy are each relevant factual allegations that ought to be considered "as part of the overall factual picture painted by the complaint." *MicroStrategy,* 115 F.Supp.2d at 631. In this case, given all of the above mentioned factors and the previously outlined averments made in the Amended Complaint, the totality of the factors alleged raises a strong inference of the requisite state of mind based on conscious behavior under any of the standards of recklessness promulgated by the various circuit courts. In particular, the Amended Complaint alleges both actual knowledge and recklessness necessary to proceed under the PSLRA, defined by the Fourth Circuit as "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Phillips,* 190 F.3d at 621.

### 3. Whether Cullather's Alleged Knowledge Forecloses His Claim

Deloitte asserts that, because Cullather purchased HM stock after critical information had been disseminated that supposedly set straight the alleged misrepresentations in the Annual Report, he cannot establish that: the Annual Report caused him to purchase the stocks; he justifiably relied on the Annual Report (because there was more accurate information available); or there were material misrepresentations.

It is certainly true that, when a plaintiff knows, before he makes a purchase, that a previous statement about the stock he is buying contains a material inaccuracy, he cannot prove that the previous statement caused his loss, that he justifiably relied on the previous inaccurate statement, or that the previous statement constitutes fraud upon him. *See Banca Cremi, S.A. v. Alex Brown & Sons,* 132 F.3d 1017, 1028 (4th Cir.1997); *Raab v. General Physics Corp.,* 4 F.3d 286, 291 (4th Cir.1993); *Pitten,* 903 F.Supp. at 949 ("When a fact is made public, it is presumed to be part of the mix of information available to the market, and it cannot be the basis for a securities fraud claim."). The Supreme Court concluded in *Basic, Inc. v. Levinson,* that "if petitioners could show that the market makers were privy to the truth . . ., the causal chain could be broken" because the stock price would reflect the new, more accurate information. 485 U.S. 224, 248, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

Deloitte lists a good deal of assertedly public information that, according to it, had been made available shortly after the Annual Report was issued. *See Motion to Dismiss Amended Complaint,* at 22–23. For instance:

1. At the annual shareholders meeting on June 21, 2000, HM announced that it would not be paying a quarterly dividend;

2. HM filed its 10–Q on July 17, 2000, explaining that (a) the Company's cash position dropped 57% to $6.5 million in three months, *id.,* at 16, (b) that the company "expect[ed] that refinancing of [various debt] objections [would] be required," *id.,* at 16, (c) that "there [could] be no assurance that such refinancing would be available on commercially reasonable terms or at all," *id.,* at 17, and

(d) that the Company's credit ratings were in jeopardy of being downgraded, *id.*, at 17;

3. 8–K (and a press release attached to the 8–K as Exhibit 99.1) dated July 24, 2000, informing the public (a) that DeRusha had left HM, (b) that he was entitled to payments of approximately $8.1 million, (c) that these obligations would result in HM falling out of "compliance with its covenants under its revolving credit facility and certain other agreements," *id.*, at Item 5, and (d) that "[t]here [could] be no assurance that the Company [would] be able to ... reach an agreement with the required lenders with respect to covenant relief," *id.*, at Item 5 and Exhibit 99.1;

4. 8–K (and a press release attached to the 8–K as Exhibit 99.1) filed on August 1, reporting that HM had to "defer certain interest payments" on long-term notes and that HM had "engaged ... Lazard, Freres & Co. LLC to assist the Company in exploring strategic alternatives" including "reorganization". *Id.*, at Item 5 and Exhibit 99.1; and

4. **HM declared bankruptcy on August 16, 2000.**

■■ Deloitte's arguments have considerable force, but it is premature to make decisions on when enough information was available to the public to preclude recovery for fraud on the misrepresentations alleged here. Those arguments present factually dependent issues of causation and reasonable reliance, not properly amenable to resolution on a motion to dismiss except in circumstances not here presented.

The precise date after which it should be determined that a plaintiff should have been on notice is a matter that cannot be determined as a matter of law at this time.

Therefore, Cullather's claims respecting purchases made after May 30 will not be curtailed based on the theory that certain public disclosures foreclose recovery as a matter of law.

## C. Common Law Fraud Claims

The Plaintiffs have conceded that their constructive fraud claims are not legally viable. *See Hearing Transcript,* February 14, 2002, at 54. Therefore, Deloitte's motion to dismiss those claims is granted.

■■ To establish actual fraud, the Plaintiffs must prove by clear and convincing evidence that: (1) Deloitte falsely represented or deliberately did not disclose (when it had a duty to disclose); (2) a material fact; (3) intentionally and knowingly; (4) with intent to mislead; (5) on which the Plaintiffs reasonably relied; and (6) which caused damage to the party misled. *See, e.g., Evaluation Research Corp. v. Alequin,* 247 Va. 143, 439 S.E.2d 387, 390 (1994). Deloitte seeks dismissal of the Plaintiffs' common law claims on several grounds. Each of these will be considered in turn.

### 1. The Plaintiffs Who Retained, Rather Than Sold Or Purchased, Their Shares Based On The Alleged Misrepresentation, Fail To Allege Causation, As A Matter Of Law

Because common law fraud is not governed by the 1934 Act, its "purchasers or sellers" requirement does not foreclose standing on the part of shareholders who retained their stocks based on an alleged misrepresentation to seek recovery under a common law fraud theory of liability. Deloitte, however, argues that, as a matter of law, the shareholders whose loss is allegedly occasioned because they retained stock in reliance on the alleged fraud cannot establish causation for the harm or

"loss". That, says Deloitte, forecloses the common law fraud claims of the retaining shareholders because harm is an element of common law fraud. The argument is that, if the "true facts" of HM's financial condition had been disclosed earlier, the same loss in share price would have still have occurred, only a little earlier, thus the loss was not caused by the misrepresentation, but rather the truth.[14] *See Motion to Dismiss,* at 24–25; *Arent v. Distribution Sciences, Inc.,* 975 F.2d 1370, 1374 (8th Cir.1992); *Crocker v. FDIC,* 826 F.2d 347 (5th Cir.1987); *Sit–Set, A.G. v. Universal Jet Exch., Inc.,* 747 F.2d 921, 928–29 (4th Cir.1984); *Levine v. Seilon, Inc.,* 439 F.2d 328 (2d Cir.1971).

In *Sit–Set, A.G. v. Universal Jet Exch., Inc.,* 747 F.2d 921, 928–29 (4th Cir.1984), the Fourth Circuit noted that:

> [u]nder the circumstances revealed by the evidence, Sit–Set was not entitled to recover the value of its unrealized bargain as an element of damages caused by Universal's misrepresentations. Under Sit–Set's theory, and in logic, had the 'true' facts of Universal's authority or the 'true' terms of Hodges's offer been represented to Sit–Set, the inevitable result would not have been an enforceable contract of sale, but an aborting of the pre-contract negotiations by Sit–Set itself. In short, Sit–Set's loss of an anticipated profit on the unrealized sale was not caused by the misrepresentations allegedly made by Universal.

*Sit–Set,* 747 F.2d at 929. *Sit–Set* is not analogous to this case on its facts and hence does not have the precedential force urged by Deloitte. But, the fundamental principle on which *Sit–Set* was decided has supplied the precise rationale on which other courts of appeals have sustained the dismissal of claims similar to those asserted by the retaining shareholders here.

For example, in *Crocker v. FDIC,* 826 F.2d 347 (5th Cir.1987), minority shareholders of a defunct bank sued certain former directors and officers who were controlling, or majority, shareholders to recover for breach of fiduciary duties, misrepresentation and violation of Racketeer Influence Corrupt Organization Act ("RICO"). The Federal Deposit Insurance Corporation ("FDIC"), in its corporate capacity, intervened and moved to dismiss. The United States District Court of the Southern District of Mississippi denied FDIC's motions, and the FDIC appealed. The United States Court of Appeals for the Fifth Circuit held that the profit opportunity that the bank's minority shareholders allegedly lost when the defendants failed to disclose the bank's true financial condition and deprived the shareholders of a chance to sell stocks at inflated prices, was too speculative to qualify as injury to shareholders individually, such as might confer on shareholders standing to bring nonderivative RICO claims.

The Fifth Circuit explained:

> The flaw in the Crockers' argument is that it assumes a market for the stock existed at an artificially high price. This inflated price, and hence the particular market for the stock, was maintained only because of the wrongdoing of the Bank's controlling shareholders, who concealed material financial information from the shareholders and the public that would have demonstrated the failing condition of the Bank. It follows that, had this information been released, the stock price would have immediately and precipitously fallen especially if, as

---

**14.** The claims of the Plaintiffs who purchased shares after May 30, 2000, and based on the alleged misrepresentations are unaffected by this aspect of Deloitte's argument because if they prove that the misrepresentation caused them to purchase shares at that time, the loss as a result would be directly attributable to the misrepresentation.

is implicit in the Crockers' theory, an entire class of shareholders had simultaneously dumped their stock on the market. Thus, there would have been no market for the stock at the artificially high price. Without such a market, the Crockers' envisioned "profit opportunity" evaporates into hardly more than an illusion. We cannot help but observe the troublesome paradox presented by the Crockers' theory: on the one hand, they claim the defendants' scheme caused their injury; yet, on the other hand, without the scheme, the minority shareholders could never have realized the artificially high profit that they claim to have unjustly lost. In sum, the Crockers complain that the scheme that harmed the minority shareholders also presented a unique profit opportunity, which the plaintiff class unfortunately missed. In any event, on this theory, the Crockers cannot plead injury sufficient to confer standing under RICO. *Crocker*, 826 F.2d at 351–52.

In *Arent v. Distribution Sciences, Inc.*, 975 F.2d 1370 (8th Cir.1992), the Eighth Circuit applied a similar approach in sustaining the dismissal, under Rule 12(b)(6), of the claims of shareholders alleging losses caused by the corporation's failure to disclose the collapse of merger discussions. Their claim also failed, as a matter of law, because any injury to those plaintiffs was not caused by [the corporation's] failure to disclose.

> *Plaintiffs were not harmed because they were unable to realize the true value of their stock—they were harmed because the true value of their stock was zero.* "Diminution in value of the corporate assets is insufficient direct harm to give the shareholder standing to sue in his own right" *Flynn v. Merrick*, 881 F.2d

446, 449 (7th Cir.1989). Plaintiffs argue that they would have sold their LAN stock had they known that the merger would not occur. But if everyone had known this adverse fact, then the stock's value would have reflected the adversity. Only if plaintiffs were the only ones DSI told, so that they could have improperly traded on inside information in dealing with third party purchasers, would disclosure have aided their investment fortunes. *Compare Crocker*, 826 F.2d at 351–52. The Seventh Circuit made this point succinctly in *Kagan [v. Edison Bros. Stores, Inc.]:* "The difficulty with [plaintiffs'] position is that the deceit is not coupled with the injury." 907 F.2d [at 690, 692 (7th Cir.1990)]. The injury in this case was caused not by DSI's alleged non-disclosure, but by the demise of LAN. That is a derivative injury. *Id.* at 1374 (emphasis supplied).[15]

■ An assessment of the causation allegations in the Amended Complaint demonstrates how proximate their common law fraud claims are to the claims in *Crocker* and *Arent*. The Amended Complaint avers:

> 73. Plaintiffs relied upon the representations and omissions in the annual report and Deloitte's audit statement in deciding whether to purchase, hold and/or sell Heilig–Meyers' stock.

> 75. Had the Plaintiffs known what was discussed at the special meetings in May 2000, that Heilig–Meyers was really being positioned to file for bankruptcy, had the Plaintiffs received the inside information that was freely shared with Deloitte, they would not have purchased shares and they would have sold

---

**15.** Deloitte also cites *Levine v. Seilon, Inc.*, 439 F.2d 328 (2d Cir.1971). Its decisional reasoning supports Deloitte's theory, but the case is of little utility because the reasoning is grounded in securities law more than principles of causation.

their stock at cut their losses. Plaintiffs held their investments because of the representations and omissions in the certified May 2000 annual report.

76. When the May 2000 annual report was released, several Plaintiffs, including Gregory Freeman, consulted professionals concerning their investment in Heilig– Meyers. Freeman was advised, based upon the statements in the audited annual report, *not* to sell his shares. Freeman did not sell.

142. The decline in the value of Plaintiffs' investment corresponds with the disclosures after May 30, 2000 of Heilig– Meyers' true financial condition. After the May 30, 2000 audit report was issued and through June 2000, the stock remained around $1.88 per share. Beginning on August 1, 2000, when it was publicly disclosed that the Company intended to evaluate "strategic alternatives"—which it had been secretly evaluating as early as the Spring of 2000—the stock plummeted. Deloitte's audit and representations fraudulently altered the price of Heilig–Meyers' stock. Investors thought they were buying into a "NEW & IMPROVING" company with a book value of $8.81. It is obvious from a review of Heilig–Meyers' stock price between May 30, 2000 and August 16, 2000, that the market did not price or factor in Deloitte's misrepresentations and omissions. The market (and the Plaintiffs) relied upon the integrity of Deloitte's audit. The stock declined precisely because it was revealed after May 30, 2000 that Heilig–Meyers had severe and irreversible financial problems.

148. Had the Plaintiffs known the truth, they would not have purchased shares of Heilig–Meyers and they would have sold all of their shares in Heilig–Meyers and taken action to protect their rights and interests. Deloitte's audit opinion induced the Plaintiffs to purchase and hold their shares.

152. In sum, Deloitte made numerous false statements or omissions of material fact with scienter upon which the Plaintiffs justifiably relief that proximately caused the Plaintiff's [sic] to lose their entire investments.

There is no significant difference between the theory of causation in the common law fraud claims of the Plaintiffs for the losses on the shares that they held then and the theory of causation advanced in *Crocker, Arent* and, indeed, even the theory of the plaintiff in *Sit–Set* (albeit on different facts). And, like the claims in those cases, the claims of the retaining shareholders here fail adequately to plead causation between the misrepresentation and the harm.

Plaintiffs, citing cases discussing loss causation under Section 10(b), point out that they need only show a causal connection between Deloitte's improper conduct and the Plaintiffs' losses and that as long as the misrepresentations or omissions are a substantial cause of the loss, other contributing facts will not bar recovery. *See, e.g., Arthur Young & Co. v. Reves,* 937 F.2d 1310, 1332 (8th Cir.1991) (Plaintiffs need only show "some causal nexus" between the accountant's improper conduct and the plaintiffs' losses); *Huddleston v. Herman & MacLean,* 640 F.2d 534, 549 (5th Cir.1981) (where the plaintiffs' economic loss is attributable to the "materialization" of the fraudulent misstatements and omissions, issue of loss causation must

be submitted to the jury); *Marbury Management, Inc. v. Kohn,* 629 F.2d 705, 708–10 (2d Cir.1980) ("Here the claim and finding are that [the defendant's] statements by their nature induced both the purchase and the retention of the securities, the expertise implicit in Kohn's supposed status overcoming plaintiff's misgivings prompted by the market behavior of the securities."); *AUSA Life v. Ernst & Young,* 206 F.3d 202, 226 (2nd Cir.2000) (liability premised on "assurances by [the defendant] which induced continued retention of a stock which ultimately plummeted in value, regardless of the cause of the final plunge in price") (citing *Continental Ins. Co. v. Mercadante,* 222 A.D. 181, 225 N.Y.S. 488 (1927) (defendants induced plaintiffs to buy and retain securities by conveying false financial information as to the earnings and solvency of the underlying obligor)).

The decisions on which the Plaintiffs reply do not help them. *Arthur Young* involved damages claimed by purchasing plaintiffs. 937 F.2d at 1328, 1332–1333. To the extent that *Huddleston* involved claims by shareholders who did not sell, the Court of Appeals rejected the trial court's measure of damages and adopted one that focused on the loss calculated on an out-of-pocket damage rule based on the date of purchase so that case is not of use here. 640 F.2d at 553–556. *Marbury Management,* 629 F.2d 705, 709–10, involved the inducement to make the investment in securities and to retain the securities by an unlicensed broker falsely purporting to be registered and thus causation for that fraud is not at all analogous to the case as presented by the Plaintiffs here.

In *AUSA Life,* the case on which Plaintiffs principally rely, the holders of notes were induced to purchase and retain privately placed notes of JWP, Inc.'s ("JWP"), allegedly based on misrepresentations made by JWP's auditors, accounting firm Ernst & Young ("E & Y"). The loss causation issue there was "whether E & Y could have reasonably foreseen that their certification of false financial information could lead to the demise of JWP by enabling JWP to make an acquisition" which essentially bankrupted the company. *Id.,* 206 F.3d at 210. The district court did not make findings on that issue and, contrary to Plaintiffs' brief, did not permit recovery for the losses occasioned by retaining the notes. Rather, the Court of Appeals remanded the case for further findings by the district court.

However, the facts in *AUSA Life* are not analogous to those presented here. Of particular distinction, among many others, *AUSA Life* concerned notes that were not traded on the open market and thus were not susceptible to the efficient market theory in the same manner that the shares of HM were. This case is akin to *Crocker* and *Arent* and, for the reasons previously stated, the Amended Complaint does not establish the requisite causation as to the retaining shareholders.

For the foregoing reasons, the Motion to Dismiss is granted as it pertains to the common law fraud claims of the shareholders who retained their shares based on the alleged misrepresentations of Deloitte.

### 2. The Amended Complaint Adequately Alleges Actual And Reasonable Reliance

Cullather and Mahoney,[16] are the only remaining Plaintiffs with potential common law fraud claims.

---

**16.** Mahoney's common law claims as a result of shares retained as a result of the alleged misrepresentation have been dismissed in

Part C.1. The claims arising from shares purchased after the alleged misrepresentation are analyzed here.

**491**

■ However, the losses on shares purchased by Mahoney after the misrepresentations allegedly made by Deloitte are not recoverable under the Plaintiffs' common law fraud claim because Mahoney expressly admits that he "purchased the latter block of shares as a result of express misrepresentations made by Heilig–Meyers' public relations personnel concerning the Heilig–Meyers' bankruptcy." *Amended Complaint,* ¶ 4. Because Mahoney expressly avers that he did *not* rely on Deloitte's alleged misrepresentations to purchase additional shares, he is not entitled to recovery from Deloitte on those shares. Thus, Cullather is the only Plaintiff who may proceed in the analysis.

■ Deloitte admits that Cullather averred reliance on the alleged misrepresentation. *Memorandum in Support of Motion To Dismiss,* at 28; *Reply Memorandum in Support of Motion to Dismiss,* at 4–5. However, Deloitte argues that Cullather cannot reasonably be said to have justifiably relied on the misrepresentation because he purchased his shares after a great deal of more accurate information regarding the status of HM became public. This argument is essentially the same argument made in an effort to preclude Cullather from asserting a federal securities claim as a purchaser after the misrepresentation. *See supra,* Part B.3. At some point, once the public was made aware of HM's plight, reliance would not be reasonable and causation could not be established. That, however, is not to be decided as a matter of law on a motion to dismiss.

## D. The Applicability Of Punitive Damages

Deloitte asserts that punitive damages are not recoverable under Section 10(b). *See Hunt v. Miller,* 908 F.2d 1210, 1216 n.

13 (4th Cir.1990); *Carras v. Burns,* 516 F.2d 251, 259 (4th Cir.1975). Plaintiffs concede this point (*Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss Amended Complaint* at 29), therefore there is no issue to be resolved regarding damage claims under Section 10(b), and Deloitte's motion is granted as to Cullather's claim for punitive damages under Section 10(b) of the 1934 Act.

■ To recover punitive damages for actual fraud,[17] Cullather must show that Deloitte acted with malice, defined as "ill will, malevolence, grudge, spite, wicked intention, or a conscious disregard for the rights of another." *Lee v. Southland Corp.,* 219 Va. 23, 244 S.E.2d 756, 759 (1978). "Punitive damages, the purpose of which is not so much to compensate the plaintiff but to punish the wrongdoer and to warn others, may be recovered 'only where there is misconduct or actual malice, or such recklessness or negligence as to evince a conscious disregard of the rights of others.'" *Hamilton Dev. Co. v. Broad Rock Club, Inc.,* 248 Va. 40, 45, 445 S.E.2d 140 (1994) (quoting *Giant of Virginia, Inc. v. Pigg,* 207 Va. 679, 685, 152 S.E.2d 271, 277 (1967), and referencing as authority *Puent v. Dickens,* 245 Va. 217, 219, 427 S.E.2d 340, 342 (1993)). *See also Booth v. Robertson,* 236 Va. 269, 273, 374 S.E.2d 1 (1988). Moreover, alleging a " 'fraudulent' ... state[ ] of mind ... does not permit recovery of punitive damages," unless the plaintiff also alleges "an element of wantoness, or malice, or overreaching." *Sit–Set, A.G. v. Universal Jet Exchange, Inc.,* 747 F.2d 921 (4th Cir.1984). Deloitte argues that the Amended Complaint does not allege that Deloitte acted with "ill will, malevolence, grudge, spite, wicked intention, or a conscious disregard of the rights of another." *Lee v. Southland Corp.,* 219 Va.

---

**17.** The constructive fraud claims have been dismissed; therefore, discussion of punitive damages arising from constructive fraud claims need not be entertained.

23, 27, 244 S.E.2d 756, 759 (Va.1978); *see also Jordan v. Sauve,* 219 Va. 448, 451–52, 247 S.E.2d 739, 741 (Va.1978). Taking all of the facts as alleged in the Amended Complaint as true, the Amended Complaint alleges adequately a case for punitive damages based on reckless disregard for the rights of others. *See supra,* Part B.2. Therefore, Deloitte's Motion to Dismiss, as it respects the availability of punitive damages for Cullather's claim of common law fraud is denied.

### CONCLUSION

For the foregoing reasons, the Defendant's Motion to Dismiss is granted in part, and denied in part.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.