747 F.2d 921
 SIT-SET, A.G., Appellant,
v.
UNIVERSAL JET EXCHANGE, INC.; Pat Janas, individually and
as President of Universal Jet Exchange, Inc.; Pat Janas
Enterprises, Inc.; Michael J. Sala, individually and as
Executive Vice President of Universal Jet Exchange, Inc. and
Bill Hodges Truck Co., Inc., Appellees,
and
William B. Owens and Investment Trading Co., Inc., Defendants.
 No. 83-1195.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 7, 1984.
Decided Nov. 1, 1984.
 
 Walter A. Smith, Jr., Washington, D.C. (Alphonso A. Christian, II, Mary Anne Mason, Hogan & Hartson, Washington, D.C., on brief), for appellant.
 James A. Kirk, Oklahoma City, Okl., (James M. Chaney, Kirk & Chaney, Oklahoma City, Okl., Kenneth E. Labowitz, Alexandria, Va., Robert E. Sevila, Douglas L. Fleming, Burke F. McCahill, Hanes, Sevila, Saunders & McCahill, Leesburg, Va., on brief), for appellees.
 Before RUSSELL and PHILLIPS, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 This is a diversity case in which Sit-Set, A.G. (Sit-Set) sued Bill Hodges Truck Co., Inc. (Hodges) alleging breach by Hodges of a contract to purchase an airplane owned by Sit-Set and, on an alternative claim, sued Universal Jet Exchange, Inc. (Universal) and two of its officers alleging that the latter, acting as broker, fraudulently misrepresented to Sit-Set the fact of Universal's authority to act as Hodges's agent and the terms upon which Hodges was willing to purchase.
 
 
 2
 Sit-Set appeals from a judgment entered on a jury verdict in favor of Hodges on the contract claim and from the district court's grant of judgment n.o.v. in favor of Universal's officers following jury verdict in favor of Sit-Set on the alternative claim against the broker and its officers.
 
 
 3
 Because of trial errors prejudicing Sit-Set on the contract claim and an error of law in granting judgment n.o.v. in favor of one of Universal's officers, we affirm in part, modify in part and remand for a new trial on the contract claim, with directions for disposition of the case depending upon outcome of the new trial.
 
 
 4
 * At the critical times leading to this litigation Hodges was a corporation engaged in the oil field trucking and drilling business with its home office in Oklahoma; Sit-Set was a Swiss corporation; and Universal was a corporate broker in executive type aircraft with principal office in Virginia.
 
 
 5
 When Universal learned in early 1982 that Sit-Set might be willing to sell a Gulf Stream II executive jet aircraft (G-II), it set about constituting itself the broker for a possible sale and purchase. Following contacts made with both Hodges and Sit-Set, Universal received the go-ahead from both to act in an ill-defined intermediary capacity in negotiating a possible sale and purchase. The exact nature of the resulting relationship between the three parties is a critical and disputed issue in this case, and it suffices at this point simply to note certain undisputed aspects of the ensuing negotiations involving the three. Principals in the negotiations were, for Hodges, its corporate President, Jack Hodges; for Sit-Set, its President, Bruce Rappaport; for Universal, its President, Patrick Janas, and an independent contractor, William Owens. During most of the critical negotiating events, Rappaport was in Switzerland, and Jack Hodges was in Oklahoma. Except apparently for one inconclusive direct contact between Rappaport and Jack Hodges, communications between Sit-Set and Hodges were transmitted through or by direction of Universal's people. Owens was Universal's direct contact with Jack Hodges, while Janas was its principal direct contact with Rappaport.
 
 
 6
 Without attempting a full account of the predictably confused communications that resulted from this loosely constructed, widely dispersed relationship, it suffices to state that the negotiations were essentially orchestrated out of Universal's home office in Virginia, and were conducted in the main by telexes between the parties and by direct and telephonic conversations between Owens and Jack Hodges on the one side and Janas and Rappaport on the other. The most critical feature of the resulting negotiations was that both Hodges and Sit-Set unmistakably relied upon Universal to communicate to each of them the evolving negotiating positions of the other.
 
 
 7
 The critical events and features of the negotiations can be quickly summarized for our purposes, though they were of course much more complicated, confused, and disputed in their details as chronicled at trial. Negotiations got under way with a succession of offers to purchase by Hodges and rejections by Sit-Set, all communicated through Universal, at prices in the range just below ten million dollars. When negotiations seemed stalled, Universal suggested to Jack Hodges that it might be helpful for Hodges to put up a "good faith deposit" of $500,000 to be applied on the purchase price. Hodges complied by sending a check in the suggested amount to Universal for purposes not clearly stated. This "deposit" was held by Universal until the negotiations aborted, at which time the right to the sum represented became a matter of contention between the three parties.
 
 
 8
 With negotiations resumed, events then proceeded fairly rapidly to their aborted end. Drastically summarized, they unfolded as follows. Following the breakdown of plans for Jack Hodges to go to Geneva to talk directly with Rappaport and to inspect the aircraft, Janas, for Universal, went instead--with Jack Hodges's knowledge and, to an extent now disputed, Hodges's authority to continue negotiations on Hodges's behalf. With Janas in direct contact with Rappaport in Geneva and Owens in direct contact with Jack Hodges in Oklahoma, a net purchase price of $10,200,000 was apparently firmly agreed upon between Hodges and Sit-Set through Universal as intermediary. At this point, however, there was apparently a misunderstanding, perhaps suspected, perhaps unknown, between Hodges and Sit-Set on one critical feature of any agreement that then existed between them: whether the sale and purchase was yet conditioned upon Jack Hodges's approval of the aircraft following a personal inspection yet to occur. The parties were then unmistakably agreed that performance was conditional upon the aircraft's passing a technical airworthiness inspection by independent third parties, but whether it was also conditioned upon Jack Hodges's personal approval remains disputed. There is no doubt that Hodges's original position on this point, both as communicated to Universal and by Universal on to Sit-Set, was that purchase was so conditioned. But subsequent communications between the three parties simply left it a disputable matter whether the condition had actually been abandoned by Hodges, or was, in any event, represented as abandoned by Universal acting with apparent authority of Hodges.
 
 
 9
 In any event, proceeding on its understanding of the agreement that had been reached at that point, Sit-Set had the aircraft flown, at Sit-Set's expense, to Savannah, Georgia, where all involved understood it was to stand at least the technical airworthiness inspection. The aircraft indisputably then passed this technical inspection, but before that occurred, Jack Hodges, asserting a continued right of personal approval, had come to Savannah, inspected the aircraft and rejected it as unsatisfactory.
 
 
 10
 At this point the whole transaction of course fell apart and this legal controversy started to develop. Hodges sought return of its $500,000 "deposit" from Universal and when this was refused, commenced a civil action in federal district court in Oklahoma to recover the sum. Quickly following this, Sit-Set commenced a civil action in federal district court in Virginia against Hodges for breach of contract and against Universal and its officers on various claims growing out of Universal's conduct as broker in the negotiations. Included among the latter claims was one for fraudulent misrepresentation by Universal and its officers that in connection with its last purchase offer Hodges had abandoned the condition of personal inspection by Jack Hodges. Following transfer of the Oklahoma action to Virginia, the cases were consolidated and eventually went to trial on that basis.[1]
 
 
 11
 At the close of the evidence, the district court submitted to the jury as mutually exclusive alternative claims Sit-Set's claim against Hodges for breach of contract and, in an ill-defined form, its claim against Universal and its officers for misrepresentation and "breach of duty" in the broker role. The jury returned a verdict in favor of Hodges on the contract breach claim, and a verdict of $23,000 in favor of Sit-Set on the claim against Universal and its officers. The district court later granted motions for judgment n.o.v. on the latter claim in favor of Universal's officers, Janas and Sala. This appeal by Sit-Set followed.[2] Sit-Set challenges the judgment in favor of Hodges on the contract claim, the adequacy of its damages award against Universal, and the grant of judgment n.o.v. in favor of Universal's officers.
 
 
 12
 For reasons that will appear, it is necessary to discuss the district court's handling of both claims, taking first the claim against Hodges for breach of contract.
 
 II
 
 13
 On the pleadings and the evidence adduced on Sit-Set's contract breach claim against Hodges, two factual issues as to liability were raised for the jury: (1) whether a contract of sale and purchase was formed, and (2) whether, if so, it had as one of its terms the condition that the aircraft must pass Jack Hodges's personal inspection for "aesthetics" as well as a technical airworthiness inspection by third parties. Hodges defended against this claim on alternative grounds that no contract was ever formed due to a failure of the parties to achieve a sufficient "meeting of the minds" on critical terms, or that if a contract was formed, Hodges's obligation to purchase under its terms was conditioned upon Jack Hodges's personal approval, which condition was not fulfilled. Sit-Set claimed on the contrary that a contract was formed as a result of negotiations carried on by Universal acting for Hodges with at least apparent authority, and that the contract as formed did not contain the personal approval condition. The evidence adduced on these theories of claim and defense was in substantial conflict on each, and a jury could properly have found for either party on the issues presented and submitted.
 
 
 14
 Regrettably, we have concluded that the verdict in favor of Hodges on this claim cannot be allowed to stand because of impermissibly extensive and intrusive interventions by the trial judge in the jury's fact-finding function. As Sit-Set has principally contended on this appeal,[3] those interjections must be taken to have prejudiced Sit-Set in the effective presentation of its claim and in the fair consideration of the claim by the jury.
 
 
 15
 Federal trial judges of course have the power and duty to govern, within bounds, the conduct of jury trials by direct participation in the examination of witnesses and by commenting, with proper deference to the jury, upon the evidence, see United States v. Cole, 491 F.2d 1276, 1278 (4th Cir.1974); United States v. Cassiagnol, 420 F.2d 868, 879 (4th Cir.1970); Pollard v. Fennell, 400 F.2d 421, 423 (4th Cir.1968), but we find those bounds so far exceeded in this case that we must assume that not only the appearance of justice, see Crandell v. United States, 703 F.2d 74, 78 (4th Cir.1983), but its reality has assuredly been compromised. No good purpose would be served by an extensive documentation from the record to demonstrate this. To illustrate the point, we note in the margin some critical examples.[4] They but highlight a course of judicial domination of the examination of witnesses so persistent throughout the trial that the result was an effective preemption of counsel's legitimate function in the adversarial process. And this occurred without any arguably justifying increase in the clarity of the evidence being elicited by counsel or in the expedition with which it was being elicited. In fact, from a review of the trial transcript the opposite result seems the more likely. Aside from, and more critical than, the disruption caused to counsel's presentation of its case, the overall effect could only have been to convey to the jury a judicial view--and a legally erroneous one--that though the issues might technically be open ones for the jury's resolution, there was but one way reasonably to resolve them.
 
 
 16
 Mindful of the virtue of achieving finality in litigation and of the harmless error imperative, we have searched the record to see if somehow these interventions might be found, when assessed in total context, not so surely to have tainted the verdict that it must be set aside. In fairness to the verdict-loser here we cannot so conclude. This was not a trial in which possibly prejudicial interventions by the court were sufficiently balanced between the parties that overall no impression of partiality for one side's position over the other's was likely to have been conveyed. Cf, United States v. Head, 697 F.2d 1200 (4th Cir.1982). The court gave a boilerplate final instruction to the jury that it was the sole judge of the facts and that it should find the facts on the evidence and not on what counsel or the judge might have said. But in the circumstances this could not be thought to have removed the impression here necessarily conveyed of judicial partiality for, indeed acceptance of, the defendant's position. See Myers v. George, 271 F.2d 168, 174 (8th Cir.1959). Because the dispositive issues to which this prejudicial judicial commentary was directed were not subject to directed verdict or peremptory instructions the commentary cannot be considered harmless error on that basis.
 
 III
 
 17
 Though, as originally pleaded, Sit-Set's action against Universal and its officers included four separate claims,[5] at the conclusion of the trial it only requested submission of a claim of fraudulent misrepresentations by Universal as a mutually exclusive alternative to its claim against Hodges for contract breach. Sit-Set's stated theory of liability on this claim was that if no contract with Hodges had been formed or if, though formed, it included the unfulfilled condition of aesthetic approval, Sit-Set's resulting economic losses were caused by its misunderstanding of Universal's authority and of the terms of Hodges's final purchase offer, which in turn were caused by Sit-Set's reasonable reliance upon Universal's fraudulent misrepresentations on those matters. On this theory Sit-Set was therefore entitled to recover compensatory damages measured by the value of its unrealized contract bargain and its reliance expenses, and to recover punitive damages because of the necessarily intentional nature of Universal's conduct.
 
 
 18
 In colloquy with counsel prior to submitting the case to the jury the court first indicated, without explanation, its intention not to submit the fraudulent misrepresentation claim. But, again without explanation, the court then permitted counsel to argue the claim to the jury and submitted it for jury consideration by concededly cursory instructions which permitted an award of compensatory,[6] but not punitive, damages as claimed by Sit-Set.
 
 
 19
 On the basis of this submission the jury returned a verdict of $23,000[7] against Universal, Janas and Sala, jointly and severally. The court then granted judgment n.o.v. in favor of Janas and Sala on the basis that the verdict represented a finding of breach of implied contract by Universal to pay Sit-Set's expenses in connection with the Savannah inspection, and that corporate officers were not liable for such corporate contractual obligations. Judgment was accordingly entered only against Universal.
 
 
 20
 As indicated, Universal and Janas, as well as Sit-Set, noted appeals from this portion of the judgment but the former two parties later dismissed their appeals, leaving only Sit-Set's before us. Sit-Set contends that the court erroneously instructed the jury on the damages recoverable on its misrepresentation claim, and that it erred in granting judgment n.o.v. in favor of Janas and Sala.[8] We disagree on the damages issue, but agree as to Janas on the judgment n.o.v. issue.
 
 
 21
 * Sit-Set contends that on the evidence adduced it was entitled to submission of a punitive damages issue on its misrepresentation claim. We disagree.
 
 
 22
 Specifically, the contention is that under Virginia law, proof of the state of mind requisite to establishing liability for the underlying common law tort of fraud suffices alone to support a discretionary award by the jury of punitive damages. On this view, therefore, an instruction permitting a discretionary jury award of punitive damages is automatically required whenever the evidence would support a jury finding of common law fraud by misrepresentation.
 
 
 23
 We recognize the existence of a significant body of authority for the general proposition that a punitive damage issue submission is required as an incident to the submission of any underlying tort claim that contains as an essential element a state of mind that corresponds in terms to the state of mind required to support a punitive damage award. See generally Restatement (Second) of Torts Sec. 908, comment c (1977) (giving as example torts "like malicious prosecution"). Indeed, this court has recently applied the principle in a common law fraud case quite similar on its facts to the instant one, but controlled by South Carolina rather than Virginia law, Hardy v. International Paper Realty Corp., 716 F.2d 1044 (4th Cir.1983).
 
 
 24
 We do not believe, however, that the Virginia decisions to which we have been directed indicate that Virginia courts would require automatic submission of a punitive damages issue in conjunction with any common law fraud claim submission, nor that they would require one in this case. While there is language in the Virginia decisions which undoubtedly can be read to include fraud cases among those having the necessary quality, see, e.g., Ford Motor Co. v. Bartholomew, 224 Va. 421, 297 S.E.2d 675, 683-84 (1982) ("conscious disregard of the rights of others" stated to be "one of the standards of punitive damages"), we think such a broad reading is not justified in light of more specific applications of punitive damage principles by Virginia courts. In the first place, the quoted language can obviously be read broadly to include not only all fraud cases but all intentional tort cases, and this clearly is not in accord with Virginia law. Indeed, in a recent case involving a common law fraud claim the Supreme Court of Virginia has made it plain that submission of a punitive damages issue is not only not automatically required in all fraud cases, but not even in all cases involving torts having malice as an essential element. Jordan v. Sauve, 219 Va. 448, 247 S.E.2d 739 (1978) (punitive damage instruction warranted on basis of evidence, though not automatically compelled by nature of claim).
 
 
 25
 From Jordan we conclude that even in respect of tort claims having as essential elements "fraudulent," or "false," or "malicious" states of mind, Virginia does not permit recovery of punitive damages except upon proof of a degree of aggravation in the critical state of mind above the threshold level required to establish liability for compensatory relief. See id. 247 S.E.2d at 741. Where this line of aggravation is to be drawn in fraud cases is of course a matter difficult of definition and application, but we read the Virginia cases as requiring an element of wantonness, or malice, or overreaching going beyond mere "shadiness" in commercial dealings. See id. at 741 ("actual malice"). In Jordan, the Virginia court indicated that submission of the issue therefore requires a legal evaluation by the trial judge that the evidence would support a finding of this degree of aggravation. Id. at 742.
 
 
 26
 In the instant case we conclude that on the evidence adduced, applying the Virginia standard of aggravation, the district judge did not err in declining to submit a punitive damages issue.
 
 B
 
 27
 Sit-Set also contends that the court erred in its instructions as to the compensatory damages recoverable under the fraud claim. Specifically, the contention is that in instructing that Sit-Set might recover the value of its unrealized bargain with Hodges if fraud by Universal were found to have caused loss of that bargain, the court completely reversed the proper rule of damages upon breach by a purchaser of a contract of sale. Sit-Set is technically accurate--the court inadvertently stated the rule for breach by a seller, a rule unfavorable under the circumstances to Sit-Set. But, laying aside the fact that Sit-Set made no specific objection to this instruction, the error was harmless in context. Under the circumstances revealed by the evidence, Sit-Set was not entitled to recover the value of its unrealized bargain as an element of damages caused by Universal's misrepresentations. Under Sit-Set's theory, and in logic, had the "true" facts of Universal's authority or the "true" terms of Hodges's offer been represented to Sit-Set, the inevitable result would not have been an enforceable contract of sale, but an aborting of the pre-contract negotiations by Sit-Set itself. In short, Sit-Set's loss of an anticipated profit on the unrealized sale was not caused by the misrepresentations allegedly made by Universal. Cf. Hardy v. International Paper Realty Corp., 716 F.2d at 1047 (only those losses demonstrably caused by misrepresentation compensable in damages). Sit-Set was only entitled to recover as damages any expenses incurred in reasonable reliance upon the misrepresentations.
 
 C
 
 28
 Finally, Sit-Set contends that the district court erred in relieving Janas and Sala of joint and several liability with Universal on the $23,000 judgment entered on the fraud verdict. As indicated, the court did this by granting judgment n.o.v. to these two officers of Universal on the basis that the liability established by the verdict was on an implied contract obligation of the corporation for which the two were not individually liable.
 
 
 29
 This was an erroneous basis for granting judgment n.o.v. There is no support in the record for any conclusion that this was the basis upon which liability was established by the verdict. Sit-Set never pleaded or asserted any such theory of recovery against Universal; there is no suggestion that it should be treated as nevertheless litigated by consent, see Fed. R. Civ. P. 15(b); and Sit-Set expressly requested submission only of a fraud theory of recovery. That theory was submitted, however incompletely, by the court, and the resulting damages award was in an amount supported by the evidence as reflecting reliance expenses properly recoverable on a fraud claim. We therefore hold, contrary to the district court's apparent view, that the jury verdict reflected a determination of liability for fraudulent misrepresentations by Universal and its officers.
 
 
 30
 Though the district court correctly held that corporate officers would not be liable for a corporate contractual obligation, this was not such an obligation. Corporate officers may of course be liable jointly and severally with their corporation for obligations arising out of tortious conduct of the officers that subject the corporation to liability. See generally Restatement (Second) of Agency Sec. 343 (1957).
 
 
 31
 We therefore hold that on the evidence adduced on the fraud claim, Janas, as the corporate officer directly engaged in the transaction with Sit-Set upon which liability was found, was liable jointly and severally on the judgment entered against Universal. The court therefore erred in granting judgment n.o.v. in favor of Janas.
 
 
 32
 As to Sala, however, we think that judgment n.o.v. was properly entered, though on another ground. The evidence of Sala's direct participation in the negotiations upon which liability for fraud was found did not warrant a finding of individual liability. Construing the evidence in the light most favorable to Sit-Set, Sala's participation was too marginal and too subject to the directions and advice of others to support a finding against him individually of intentional misrepresentation with intent to defraud.
 
 IV
 
 33
 There remains the problem of the appropriate disposition of this appeal in view of the complexities introduced by our decisions respecting the judgments on Sit-Set's mutually exclusive alternative claims. We have concluded that the most appropriate disposition is to remand the breach of contract claim against Hodges for a new trial, with ultimate disposition of the case as a whole to abide the outcome of that re-trial.
 
 
 34
 As Sit-Set has understood all along, it cannot as a matter of substantive law recover on both claims, though it might at the outset have lost on both. Now, however, it has been found irreversibly entitled to recover on the claim which obviously is the less preferred alternative, given the amount of the recovery awarded in a judgment that has also now been affirmed on appeal. At the same time, Sit-Set has been found on this appeal to be entitled to a new trial in respect of the other claim which carries the possibility of a more favorable recovery than that now held.
 
 
 35
 Judicial economy as well as principles of repose dictate salvaging so much of what has been done without error as may be, rather than simply directing a retrial of the whole. But accommodation must be made in that process both for the contingencies of more or less favorable results for Sit-Set upon re-trial of the contract claim, and for the substantive prohibition against giving duplicative or inconsistent relief.
 
 
 36
 To accomplish these purposes and accommodate that principle, we therefore modify the judgment in favor of Sit-Set against Universal by adding Patrick Janas as a defendant jointly and severally liable, and as so modified, we vacate that judgment pending the outcome of a new trial of the claim by Sit-Set against Hodges; we reverse the judgment in favor of Hodges on the breach of contract claim by Sit-Set, and remand that claim for a new trial in accordance with this opinion; we direct that upon conclusion of the new trial, including rulings upon any timely post-verdict motions, Sit-Set shall make a formal election in writing between entry of judgment on any verdict in its favor received in the new trial or re-entry of the judgment against Universal and Janas as modified and affirmed on this appeal; and we direct that the district court shall thereupon enter judgment in accordance with Sit-Set's election, dismissing with prejudice the claim not elected for entry of judgment in its favor by Sit-Set.
 
 
 37
 SO ORDERED.
 
 
 
 [1]
 In Hodges's original action against Universal, Universal filed an interpleader, depositing in court $400,000 of the $500,000 "deposit" to abide resolution of the conflicting claims of Hodges and Sit-Set to the sum. Universal claimed $100,000 of the total deposit as a broker's commission owed by Hodges. In the litigation of those conflicting claims between Hodges and Universal, Hodges completely prevailed. The resulting judgment in favor of Hodges is not before us on this appeal
 
 
 [2]
 Universal and Janas also noted appeals from Sit-Set's judgment against them, but later dismissed their appeal
 
 
 [3]
 Other trial errors were assigned by Sit-Set, including the refusal by the court to instruct on apparent authority, a critical issue in the case. Because it is not necessary to address the other assignments to dispose of this appeal, we decline to do so. Upon retrial, the issues to which they related may or may not be raised again in the same or different form. If they are raised, we are content that they be addressed anew as matters for first instance consideration by the district judge to whom the case is assigned for retrial
 
 
 [4]
 In relation to the disputed issue whether, despite the conceded lack of agreement on all terms, a contract of sale might nevertheless have been formed, see Va. Code Sec. 8.2-204 (contract for sale may exist despite open terms, if parties so intend and reasonably certain basis for remedy exists), the following exchange occurred in the presence of the jury during the examination of Janas, Universal's President:
 JANAS: I reduced it [the agreement] to the telex.
 THE COURT: I understand, but there's a lot missing. There's nothing in that agreement, that's in that acceptance that says anything about when you're going to pay, how your're going to pay. There's nothing said in there about a deposit, nothing in there that says whether it's all cash, what the interest is, and there's just so much there as a salesman there's no doubt in your mind that wouldn't be an agreement between the two of them.
 JANAS: You're absolutely right.
 THE COURT: It's the making of an agreement.
 JANAS: The making of an agreement.
 THE COURT: It isn't until it's reduced to terms. It falls far short of it.
 In relation to the critical issue, disputable on the evidence, whether in the course of the negotiations Hodges, through Universal as its apparent agent, abandoned as a term of its original purchase offers the condition that the aircraft pass a personal "aesthetic" inspection, the following judicial comments and interjections occurred during the examination of witnesses in the presence of the jury:
 THE COURT: [H]e bought it subject to an inspection .... He said he would take it subject to his right to inspect it under certain conditions.
 * * *
 There's nothing unreasonable (sic) about a man buying a house without looking at it and the same with an airplane. He's got a right to look at it.
 * * *
 Then do you have the right to look at a $10,000,000 airplane? I can't imagine anyone buying one without looking at it himself or letting some authorized person look at it for him.
 * * *
 THE COURT: If I bought a house and I reserved the right to go and look at it, I might not like the shape of the rooms. It might be a perfect house.
 * * *
 THE COURT: You produce some evidence to me or to this jury that people that buy a $10,000,000 airplane and don't know what's in them.
 * * *
 What's the difference what he told him, because the acceptance, the offer is expressly conditioned on a specified inspection. ... [Hodges] wanted to inspect it and the whole offer was conditioned upon his right to inspect it, according to this telegram.
 
 
 [5]
 For specific performance of a "contract" to turn over the $500,000 "deposit" upon Hodges's "default"; for conversion of the "deposit"; for "breach of warranty" by Universal that the sales contract would be performed; and for fraudulent misrepresentations by Universal in the contract negotiations
 
 
 [6]
 The court's instruction can reasonably be interpreted to include as compensable items, if liability for fraud were found, the value of the unrealized contract bargain and Sit-Set's reliance expenses. Sit-Set, though challenging the adequacy of the instruction as to the loss of bargain item, apparently concedes that this was the reach of the instruction
 
 
 [7]
 A $23,000 plus figure was given by one of Sit-Set's witnesses as an estimate of Sit-Set's expenses incurred in having the aircraft flown to Savannah
 
 
 [8]
 Sit-Set also seems to challenge the adequacy of the court's instruction on misrepresentation. As Universal correctly notes, however, Sit-Set simply is in no position to make that challenge in view of its position, correct in our view, that the jury's verdict in its favor is only supportable as a finding of fraudulent misrepresentation by Universal